**TREE TAVERN PRODUCTS, INC., Plaintiff,**

v.

**CONAGRA, INC., Defendant.**

Civ. A. No. 86–156 CMW.

United States District Court, D. Delaware.

Aug. 12, 1986.

Harold Pezzner, of Collolly, Bove, Lodge & Hutz, Wilmington, Del. (Lawrence I. Lerner, Esquire and Paul H. Kochanski, of Lerner, David, Littenberg, Krumholz and

Mentlik, Westfield, N.J., of counsel), for plaintiff.

Walter L. Pepperman, II, and Palmer L. Whisenant, of Morris Nichols Arsht & Tunnell, Wilmington, Del. (Richard H. Compere, Esquire and Jeffery A. Handelman, of Willian Brinks Olds Hofer Gilson & Lione Ltd., Chicago, Ill., of counsel), for defendant.

CALEB M. WRIGHT, Senior District Judge.

Plaintiff Tree-Tavern, Inc. seeks a preliminary injunction in this trademark infringement action. Plaintiff holds exclusive rights to the 20-year-old, registered trademark "Side Dish", under which it sells frozen stuffed potatoes flavored with cheddar cheese and frozen stuffed potatoes flavored with sour cream and chives in a geographic area extending from Massachusetts to the suburbs of Washington, D.C.. In 1985, defendant ConAgra's Banquet Foods Company division began selling frozen, single-serving packages of rice, noodles, stuffing and potatoes under the title "Side Dish for One." Plaintiff has moved to enjoin preliminarily what it contends is defendant's infringing use of its "Side Dish" trademark.

## I. FACTS

In 1985 plaintiff purchased for $800,000 the frozen-potato line of business of Dell Products Corporation ("Dell"). The purchase included equipment, formulas and manufacturing procedures, 400,000 packages of finished product, 800,000 empty cartons, and the assignment of Dell's federal registration for the designation "Side Dish", for frozen potatoes stuffed with sour cream and chives. Dell had registered "Side Dish" on April 23, 1968, at which time the United States Patent and Trademark Office (PTO) placed the mark on the principal register. The mark achieved the status of incontestability when, after five years of continuous use, Dell filed and the PTO accepted the requisite declaration under Section 15 of the Lanham Act, 15 U.S.C. § 1065 (1982). Dell continuously used the mark for its line of frozen potatoes stuffed with cheddar cheese or sour cream and chives until it assigned the trademark and registration to plaintiff in 1985. The assignment was recorded in the PTO on November 21, 1985.

Plaintiff was formed in the mid-1950's as a family business engaged in selling frozen foods, in particular frozen pizza. Its headquarters and sole manufacturing facilities are in northern New Jersey. When it acquired the "Side Dish" line of frozen potatoes from Dell to expand its product line, it continued Dell's marketing plan of selling primarily to food brokers and supermarket chains serving metropolitan areas from Massachusetts to Virginia. Plaintiffs also continued Dell's policy of not independently advertising the "Side Dish" product, but of offering a promotional allowance to supermarket chains, which then would advertise the "Side Dish" product in weekly fliers to customers. Sales of "Side Dish" potatoes have increased at a steady rate during the past three years. Current annual sales approximate three-quarters of a million dollars.

Defendant's Banquet Foods Co. division is a major producer of frozen foods throughout the United States. It is perhaps best known for its frozen fried chicken. In late 1984 and early 1985, defendant decided to sell, in a mix-and-match format, for use as main courses and side dishes of meals, single-serving frozen foods packaged in plastic cooking bags or pouches. It called the main-course products its "Entree for One" line, and decided on the name "Side Dish for One" for its packages of chicken-flavored stuffing, parselyed noodles, vegetable rice and au gratin potatoes. By July 1985, defendant had completed its package design for the "Side Dish for One" line, and had mailed promotional material to food brokers across the country. Defendant introduced the "Side Dish for One" product line in September 1985, and achieved national distribution on January 3, 1986.

Plaintiff learned of Banquet's intended use of the term "side dish" in late 1985.

Plaintiff's counsel wrote to ConAgra on January 9, 1985, and notified it of the existence of plaintiff's "Side Dish" trademark and plaintiff's belief that "Side Dish for One" infringed upon it. Intermittent contact between counsel ensued. ConAgra responded through counsel on March 7, 1986, that it considered "side dish" a generic term ineligible for trademark protection, and refused plaintiff's demand that it not use the term. Plaintiff filed this action on April 11, 1986, and moved for a preliminary injunction on May 20, 1986.

Plaintiff contends that defendant's use of the designation "Side Dish for One" is unfair competition and trademark infringement in violation of the Trademark Act, 15 U.S.C. §§ 1051–1127 (1982), as well as trade disparagement and unfair competition under the common law of the State of Delaware. Defendant contends that the term "side dish" is generic and thus not entitled to trademark protection. In the alternative, it claims that "Side Dish" is such a weak mark that, when used in conjunction with defendant's well-known "Banquet" mark, offers little likelihood of confusion. Defendant further contends that its use of the words "side dish" constitutes good-faith fair use of the term, and that plaintiff has failed to show irreparable harm.

## II. DISCUSSION

The standard for the issuance of a preliminary injunction in this circuit is well established.

> Before a district court may issue a preliminary injunction it must consider whether the movant has shown that it is likely to prevail on the merits, whether the movant has shown irreparable harm in the absence of such relief, whether such relief will substantially harm other parties, and where the public interest lies.

*Premier Dental Products Co. v. Darby Dental Supply Co. Inc.,* 794 F.2d 850 (3d Cir.1986) *citing Commonwealth of Pennsylvania v. United States,* 469 F.2d 1387 (3d Cir.1972).

### A. Likelihood of Prevailing on the Merits

1. GENERIC TERM

■ Defendant argues principally that "Side Dish" is a generic term that is not entitled to trademark protection. In support of this argument, it has provided the Court with samples of other companies' food packaging and promotional material that use the term "side dish", and has produced nineteen examples of the term being used to describe food products for trademark registrations for pending applications, numerous dictionary definitions, and hundreds of references to the term in magazines and newspapers.

> Marks that constitute a common descriptive name are referred to as generic. A generic term is one that refers to the genus of which the particular product is a species. Generic terms are not registerable, and a registered mark may be cancelled at any time on the grounds that it has become generic.

*Park 'n Fly Inc. v. Dollar Park 'n Fly Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (citation omitted).

Defendant claims that "side dish" is a generic term for food products that are coordinate to the main course of a meal. It contends that plaintiff uses the term in association with potato products that are commonly used and referred to as side dishes, so it cannot claim trademark rights to this generic term.

Plaintiff concedes that "side dish", when used in a restaurant or dinner-table context, is generic for portions of food that accompany a main course. It contends, however, that "side dish" is not generic when used in connection with frozen foods, in particular, frozen potatoes.

The Court's determination of whether plaintiff uses the term "side dish" in its generic sense thus evolves from how broadly it defines the term. Defendant believes that the term encompasses food, fully prepared or not, that is used to accompany the main course of a meal. Plaintiffs assert that the term commonly de-

scribes a portion of prepared food comprising part of a meal, but not various unprepared foodstuffs that have yet to leave the supermarket.

The immediate question before the Court, therefore, is "At what point does a food item become commonly known as a 'side dish'?" The role of one potato in the food chain provides a suitable illustration with which to analyze this issue. Clearly, an unharvested potato lodged underground is not a side dish. Nor is the potato a side dish immediately after it is dug up, or when it is sold to a wholesaler. The potato is not a side dish when the wholesaler sells it to a food company (such as plaintiff or defendant). It is not a side dish during processing by that food company. Does it become a side dish when the finished potato product is packaged at the company's plant? When it is shipped to food brokers and supermarkets? When it is displayed in the store? When purchased? During preparation? Without question the potato is a side dish when it is fully cooked and proudly served as part of a meal. What remains unclear is at what earlier stage, if any, did the tuber become commonly known a side dish?

Dictionary definitions of the term "side dish" support plaintiff's view that food, such as the potato whose life and adventures we have tracked above, is commonly understood to be a side dish once it reaches the last stage—that is, when it is served as part of a meal. *Websters Third New International Dictionary* defines "side dish" as "one of the foods subordinate to the main course *of a meal. Webster's Ninth New Collegiate Dictionary* defines it as "a food *served* separately *along with the main course." Funk & Wagnalls Standard Comprehensive International Dictionary* defines the term as "A portion of food subordinate to the main dish or dishes *of a course;* also, the small dish *in which it is served." The World Book Encyclopedia Dictionary* defines "side dish" as "1. an item of food *served* in addition to the main dish *of a course or meal: TO HAVE PEAS AS A SIDE DISH.* 2. a dish, especially a small dish, for *serving of such an*

*item of food. The Oxford English Dictionary* defines side-dish as "A dish which is accessory or additional to the principal one *in a course;* a dish of the kind commonly used for this purpose." (Emphasis added in each definition.)

The common thread running through these definitions is the notion of being part of a meal. Meals are necessarily ready-to-eat. When someone goes for the groceries, the shopping basket filled with ingredients for appetizers, main courses, side dishes and desserts is not a meal. The very same ingredients, prepared and set on a table for imminent human consumption, become a meal. At that time, the different foods that make up the meal become commonly known as appetizers, main course, side dishes and dessert. The second dictionary definition of "side dish"—a dish in which the item of food known as a "side dish" is served—further supports plaintiff's contention that a food is not a side dish when it is still frozen and on the supermarket shelf.

The situation here differs from that in *In re Northland Aluminum Products, Inc.,* 777 F.2d 1556 (Fed.Cir.1985). There Northland Aluminum appealed the PTO examiner's rejection of its application to register the term "Bundt" for a ring-cake mix. The examiner based the rejection on grounds that "bundt" was a generic term for a particular type of cake. The United States Patent and Trademark Office, Trademark Trial and Appeal Board (TTAB) and the Court of Appeals for the Federal Circuit affirmed the rejection on the same grounds. Both the TTAB and the Court of Appeals rejected plaintiff's distinction between a cake, as a finished product, and its packaged cake mix. 221 U.S.P.Q. 1110, 1114 (T.T.A.B.1984); 777 F.2d at 1561.

The *Northland Aluminum* decisions rest on the finding that "bundt" is generic for a particular type of cake. In addition, the Court of Appeals held that one can not register an item's generic name—in that case a particular type of cake—as a trademark for a packaged product which, upon preparation, yields the item. Unlike

"Bundt", however, the term "Side Dish" does not name any particular type of item, prepared or not.[1]

*Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976) similarly lends little support to defendant's argument that common usage of "side dish" renders it generic. There the Court affirmed in part the District Court's cancellation of Abercrombie & Fitch's (A & F) trademark registration of the term "Safari" as having become generic when used with particular (but not all) types of clothing. The Court distinguished between different generic uses of the word "safari," noting that "A & F could not apply 'Safari' as a trademark for an expedition into the African wilderness. This would be a clear example of the use of 'Safari' as a generic term." 537 F.2d at 11. The Court then discussed the less-obvious generic use of the word "safari" to describe a contemporary, khaki-colored outfit well known to the clothing industry and its customers: the broad, flat brimmed "Safari hat", the "Safari jacket", a belted bush jacket with patch pockets and a buttoned shoulder loop, and the safari jacket and pants combo known as a "Safari suit." The Court struck down A & F's "Safari" registration for these and other items associated with these particular items or treks through the African wilderness.

The Court let stand, however, A & F's "Safari" trademark registration for shirts, boots, shorts, luggage, portable grills and miscellaneous other "suburban paraphernalia", finding "nothing to suggest that the uses included in these registrations ... are the common descriptive names of either current fashion styles or African expeditions. The generic term for A & F's 'safari cloth Bermuda shorts', for example is 'Bermuda shorts, not 'safari'." 537 F.2d at 12–13, 15.

*Abercrombie & Fitch* shows that a term can have more than one generic use. It also shows that a generic use of a term for some items (in that case, to describe a style of hat, jacket, and suit), does not foreclose trademark use for related items (for example, shirts, boots, shorts and luggage), as long as the term is not commonly descriptive of them.

Here no one contests that "side dish" is a generic term for food served in a restaurant or at home to accompany a main course. As in *Abercrombie & Fitch,* however, the generic use of the term to describe prepared food set on a table does not necessarily require cancellation of plaintiff's trademark registration for frozen food products.

Unlike common descriptive names for products such as "rice" or "potatoes", the term "side dish" does not attach to any discernible type of food. A number of different foods—rice, noodles, fruits, vegetables or bread, for example—can become side dishes when served as part of a meal. At the retail level, the term "side dish" merely suggests a manner in which the consumer can serve a product after it is prepared.

Plaintiff sells its potatoes frozen. No one serves frozen potatoes as an accompaniment to a main course. "Side dish" is not a term commonly used to describe frozen foods. No one heads for the "side dish" section of a supermarket.

Just as "Bermuda shorts", not "safari", was the generic term in 'safari cloth Bermuda shorts', 537 F.2d at 13, here "stuffed potatoes", not "Side Dish" is the generic term in plaintiff's "Side Dish Stuffed Potatoes." Plaintiff's mark is not generic in this context, and plaintiff can rely in its incontestability to enjoin infringement. *Park n' Fly,* 469 U.S. 189, 204–05, 105 S.Ct. 658, 667, 83 L.Ed.2d 582.

## 2. FAIR USE

▮ Defendant contends that, even if "side dish" is a valid trademark for frozen stuffed potatoes, its use of the term in

---

**1.** A parallel situation to *Northland Aluminum,* to use one of defendant's product as an example, would be an attempt to register the term "au gratin" for packaged ingredients for au gratin potatoes.

conjunction with its "Banquet" house mark constitutes "fair use" under the Lanham Act. 15 U.S.C. § 1115(b)(4). It also contends that, like other food companies that use the term "side dish" on their packaging and in their advertising, it is free to use the term "side dish" in the phrase "Side Dish for One" to describe its product's suggested use as a single-serving accompaniment to a main course (preferably one of its "Entree for One" selections).

Plaintiff counters that while other food companies use the term "side dish" on packaging and in advertising merely to describe a use for their products—fair use under the Lanham Act—defendant cannot avail itself to the fair use defense because it, unlike the others, uses "Side Dish for One" as a trademark.

Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4), offers a defense even as against marks that have become incontestable. "The 'fair use defense' permits the use of a name or term, *other than as a trademark,* that is descriptive and is used fairly and in good faith only to describe the goods. § 1115(b)(4). This defense is not available if the alleged descriptive use is in fact a trademark use." *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 937 (10th Cir.1983), *citing Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1187 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816; *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d at 12–13, (emphasis in original).

The three most obvious uses of the term by other companies that defendant presented to the Court are by Hain Pure Food Co., Inc., Stouffer Food Corp. and Thomas J. Lipton, Inc. Hain markets a line of "Hain Naturals"; dry, packaged, mixed rice, wheat and barley. On the packaging and advertising for this product line, the term "side dish" appears after the "Hain Naturals" mark and the generic description of the individual item.[2] On the front of each package, the house mark "Hain Naturals" is set in a stylized, brown and white, shadowed text on a curved banner across the top of the layout. Below the banner is an oval photograph of the finished, garnished product on a serving platter in front of a main-course food, such as chicken or seafood. The generic description ("Rice Almondine", "Rice Teriyaki", "3–Grain Spanish Style", etc.) appears directly underneath, in the largest type on the package.

The descriptive words "Almondine", "Teriyaki", "Spanish", etc., are capitalized in bold, white, outlined letters on a mostly-horizontal, curving, colored background that resembles a loop of ribbon. The generic term "Rice" or "3-Grain" is outlined in bright, dusk-colored, large letters. It appears suspended above and to the left, but slightly inside the ribbon loop.

In contrast, the term "Side Dish" is set in appreciably smaller, solid, orange-yellow text. It resides in its own brown, plaque-shaped, eight-sided box centered below and again slightly inside the loop. The graphics clearly focus attention on the generic description of the product; the de-emphasized "side dish" looks to be an after thought.

The same configuration of descriptive words and graphics appears on the top flap and, for some items, the bottom flap of the package.

A Hain magazine advertisement begins with large-point copy: "Finally. Side dishes that don't go against the grain." Later copy in the advertisement refers to "Hain Naturals" 3-Grain Side Dishes." Nowhere in the materials presented to the Court does Hain use the term "side dish" in a trademark sense. Its use of the term simply describes the product and likely is good-faith fair use under the Lanham Act.

Stouffer's uses the term "side dish" primarily in its advertising and displays for its

---

**2.** Examples include: "Hain Naturals Rice Almondine 3–Grain Goodness Side Dish;" "Hain Naturals Rice Teriyaki 3–Grain Goodness Side Dish;" "Hain Naturals 3–Grain Spanish Style Side Dish;" "Hain Naturals 3–Grain Herb Side Dish;" "Hain Naturals 3–Grain Beef Meatless Style Side Dish;" "Hain Naturals 3–Grain Chicken Meatless Style Side Dish;" and "Hain Naturals 3–Grain Italian Style Side Dish;".

"rice Side Dishes" (Apple Pecan Rice, Rice Medly) and "pasta Side Dishes." (Linguini with Pesto Sauce, Fettucini Primavera). Stouffer's uses "side dish" on its packaging only in text on the reverse side of the package, where it extolls the product. ("An exciting and savory side dish....") This clearly is not trademark usage. Like Hain, Stouffer's merely uses the term to describe its products.

Lipton, like others, uses the term "side dish" on the back of its Noodles & Sauce and Rice & Sauce packaging either in text ("... for a deluxe side dish that adds a special touch to any meal.") or as the heading for cooking directions. For instance, the reverse side of the "Lipton Deluxe Noodles & Sauce Alfredo" package has, in a script headline, the words "Side Dish Directions," followed by instructions for the product's preparation. Immediately below is a recipe captioned, in the same typeface, "Exciting Main Dish Idea," followed by a photo and recipe for use of the product as a main course. Lipton's use of the term "side dish" here clearly is a non-trademark, descriptive one.

Defendant's packaging, on the other hand, prominently displays "Side Dish for One" in bold print after its "Banquet" housemark, above the plain text generic description of the individual product ("Au Gratin Potatoes", "Chicken Flavored Stuffing", "Vegetable Rice in Light Butter Sauce" and "Parsleyed Noodles in Light Butter Sauce"). On the front of the package, the Banquet mark and the boldface "Side Dish for One" stand side-by-side in a separate section atop the product's generic description. A photo of the prepared product completes the design below. On three side panels of the package, the "Banquet" mark appears with the other words. There the "Banquet" mark is to the left of the phrase "Side Dish for One" stacked above the product's generic name. Defendant's press release concerning its new product

line labels it as Banquet's "Side Dish for One" line of side dishes.[3]

In *Beer Nuts,* the Court considered several factors to determine if a defendant could sustain the defense of fair use to avoid infringement: (a) Is the use of the term meant to attract public attention? (b) Is the term a prominent element on the package? (c) What size is the lettering? (d) How different is the typestyle? (e) Is the term set off? (f) Does a subordinate phrase actually describe the product being sold? 711 F.2d at 937–38.

Application of each of these factors leads to the inescapable conclusion that defendant uses "side dish for one" in a trademark, rather than a descriptive sense. The phrase is the first writing after defendant's "Banquet" house mark. Its prominent positioning is meant to attract the consumer's attention and cause him or her to associate it with Banquet's "Entree for One" product line. The phrase's bold lettering is the largest on the package. It is set off from both the house mark and the generic description, and modifies the generic description of each individual product.

The Court concludes that, unlike the other food companies whose packaging defendant has presented, defendant uses the term "side dish" in a trademark sense. It thus cannot rely on the Lanham Act's fair-use defense.

3. LIKELIHOOD OF CONFUSION

■ The fact that a mark is not generic and incontestable does not remove it from the public domain. A party may use another's trademark as long as there is no likelihood of confusion. Once a trademark owner demonstrates likelihood of confusion, however, it is entitled to injunctive relief. *Interpace Corp. v. Lapp Inc.,* 721 F.2d 460, 462 (3d Cir.1983).

The Third Circuit has set forth a number of factors for the Court to consider in

**3.** The press release states, in pertinent part: "BALLWIN, MO.—ConAgra, Inc.'s Banquet Foods units will move in on another market segment as it introduces "mix-and-match" frozen entrees and side dishes under the Entree for One and Side Dish for One labels." (Supplemental Declaration of Louis Francia, ¶ 3.)

**1270**

determining likelihood of confusion in cases such as this:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace,* 721 F.Supp. at 463, *citing Scott Paper Co. v. Scott's Liquid Gold, Inc.* 589 F.2d 1225, 1229 (3d Cir.1978).

*(1) Degree of Similarity.* The similarity between the marks "Side Dish" and "Banquet Side Dish for One" is obvious—defendant uses plaintiff's trademark "side dish" with the addition of its "Banquet" house mark and the words "for one." Both are used to frozen food meant to accompany a main course. Both plaintiff and defendant use the marks to modify the generic descriptions of their products.

*(2) Strength of the Mark.* The common use of "side dish" for prepared foods that accompany a main course makes the term a very weak mark. It thus is not entitled to a wide a range of protection against alleged infringement. *See generally* 1 J.

McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 11:24 (2d ed. 1984).

Unlike a strong mark, such as "Polaroid" or "Kodak", the public would attribute little, if any, trademark significance to the term "side dish" as an indication of origin of products unrelated to frozen stuffed potatoes. But even a weak mark has strength to cause likely confusion with another mark having the same format and appearance and used for a closely related line of goods sold in the same territorial area. *Id.*

The products here are without question related. Each is a frozen food item designed to accompany a main dish as part of a meal. Both plaintiff and defendant sell a potato with cheese product under their respective marks.

"Where a mark is inherently weak and limited evidence of secondary meaning is shown, the use of a strong house mark distinguishes the competitive uses." *Yoo-Hoo Chocolate Beverage Corp. v. A.J. Canfield Co.,* 229 U.S.P.Q. 653, 663 (D.N.J. March 19, 1986) [Available on WESTLAW, DCTU database] (No one can acquire exclusive rights to words Chocolate Fudge Soda) (citation omitted) Any reasonable consumer buying defendant's product would understand that its origin is Banquet and not plaintiff. *Id.* In this sense, the presence of the "Banquet" mark might tend to lessen confusion.

Plaintiff's product, however, is not accompanied by a strong house mark. Unlike *Yoo-Hoo,* where both plaintiff and defendant prefaced the term "chocolate fudge" with their strong house marks, here plaintiff's weak mark stands alone. For example, a person buying plaintiff's product might think it but a two-serving package of defendant's side dish product line. In this sense the presence of the Banquet mark may enhance rather than lessen the likelihood of confusion. *Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d 352, 255 (7th Cir.1983); *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 663 (2d Cir. 1970) (By adding strong "Revlon" house

mark to weak "Trim" mark, Revlon might have sought to couple benefits of "Trim" mark with persuasive powers of its own name, possibly promoting confusion.); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972) ("Addition of house mark could lead purchaser to think plaintiff had licensed defendant as second user; addition is thus "an aggravation, and not a justification.") (citations omitted.) Here, the weakness of plaintiff's mark and the addition of defendant's "Banquet" house mark give no indication either way as to likelihood of confusion.

*(3) Price/Care and Attention of Consumers.* Plaintiff and defendant sell their product in the same general price range. The products are sold primarily in the frozen food sections of supermarkets, presumably near each other given the identity of their intended use.

Although the principal source of confusion, if any, comes from the similarity of the words, similarity in packaging design also goes to the care and attention expected of consumers in distinguishing the products. Plaintiff's packaging contains the words "side dish" in red, ascending and descending letters shaped in the form of a baked potato, located over a dish design on the top left side of the package front. The generic description "stuffed potatoes" is printed in large, bold, capital letters to the right of the stylized "side dish" across the rest of the package top. The words "with cheddar cheese" or "with sour cream & chives are printed in smaller capital letters directly beneath "stuffed potatoes." The horizontal area in which the lettering is set takes up slightly more than one-quarter of the package front. This area is orange for the cheddar cheese version and green for the sour cream and chives version of plaintiff's product.

The remainder of the package front is covered by a photograph of the finished product on a plate set on table beside a roast beef (cheddar cheese) or a roast chicken (sour cream and chives). The side panels also are solid orange or green, and repeat the lettering design from the top of the package front. The side panels also indicate that the package contains two servings. The back is also solid-colored, and contains cooking directions, ingredients, house mark and the company name and address.

Viewed from the front, as they would appear to a consumer in a store, the packages appear to be the same size. (Plaintiff's package is about twice as thick as that of defendant.) Defendant's au gratin potatoes package and plaintiff's stuffed potatoes with cheddar cheese package both have orange as their dominant color. Plaintiff uses its mark for stuffed potatoes with sour cream and chives and stuffed potatoes with cheddar cheese. One of defendant's products, au gratin potatoes, is a potato with cheese product.

Plaintiff sells its potatoes two to a package. A person not familiar with both products might think that plaintiff's twin-pack "Side Dish" stuffed potatoes is a double-serving version of defendant's "Side Dish for One" line. When told by another to pick up some "side dish" frozen potatoes to go with the main course at dinner, the uninitiated purchaser might, without further instruction, purchase defendant's product as easily as plaintiff's.

*(4) Length of Time Without Evidence of Actual Confusion.* Defendant has distributed its product under the "Side Dish for One" mark since January 1986. Prior to that time it distributed it for several months in geographic areas in which plaintiff does not sell its product. Plaintiff moved for a preliminary injunction in late May, 1986. The brief time period in which plaintiff and defendant have sold their products in the same geographic markets, without evidence of actual confusion arising, is too little time for this factor to bear on any likelihood of confusion.

*(5) Intent.* There is no evidence that defendant intentionally adopted the mark "Side Dish for One" to trade on plaintiff's goodwill, or for any reason other than to suggest a use for its product's compatability with its "Entree for One" line of single-serving frozen foods. Defendant already

had designed the packaging and introduced the product in the trade press before learning from plaintiff's counsel that plaintiff believed defendant's mark infringed its registered "Side Dish" trademark. On its counsel's advice that "side dish" was a generic term not entitled to trademark protection, defendant continued to use the term and to promote its product. Defendant's intent in adopting its mark does not increase or decrease the likelihood of confusion.

*(6) Evidence of Actual Confusion.* Plaintiff presents one instance that it describes as actual confusion concerning the products. After defendant began marketing its product in the same geographical areas as plaintiff, a food buyer deducted from plaintiff's invoice a discount for national brands. There is an implication, but no evidence, that the food buyer confused plaintiff's and defendant's products.

Although plaintiff has not presented firm evidence of actual confusion, this absence must be balanced against the relatively short time period between the date defendant introduced the product in plaintiff's marketing area and the date plaintiff moved for a preliminary injunction. Once again, the absence of evidence of actual confusion during the brief time period is only marginally relevant to the Court's determination of likelihood of confusion.

*(7) Same Channels of Trade.* Both product lines are marketed through the same channels of trade. Both are sold to food brokers and supermarket chains for sale in frozen food sections of retail stores. Defendant advertises its product nationally, while plaintiff uses only cooperative advertising in supermarket fliers. Were a supermarket to promote defendant's product, however, both products likely would be advertised in the same store flier.

*(8) Targets of Sales Efforts.* The parties target the same consumers—grocery shoppers who might purchase frozen processed foods. Both products' packages conspicuously note their microwavibility, which indicates that microwave-oven users are a specific target market.

*(9) Similarity of Function.* The products' identity of functions—inexpensive, easy-to-prepare, frozen food that can be served in single portions to accompany the main course of a meal—leaves little doubt that consumers would relate the goods in their own minds.

*(10) Consumer Expectation of Expansion into Other Market.* Consumers familiar with plaintiff's product might expect plaintiff, whom they identify through the twenty-year old "side dish" trademark, to expand into variations on the potato or other frozen foods for use as side dishes, such as noodles, rice, and stuffing.

In sum, the factors that do not favor plaintiff's likelihood of success on the merits are either ambiguous or only marginally relevant. The Court concludes that plaintiff has shown that it is likely to prevail on the merits.

*B. Irreparable Harm*

■ "For a preliminary injunction to issue, there must be a showing of immediate irreparable harm, or a presently existing actual threat of harm. The harm must be imminent." *Premier Dental,* 794 F.2d 850, 858 (3d Cir.1986).

"A trademark symbolizes the public's confidence or 'goodwill' in a particular product." *Id.* at 853. " 'Goodwill' is the advantage obtained from use of a trademark. This includes public confidence in the quality of the product and in the warranties made on behalf of the product, and the 'name recognition' of the product by the public that differentiates that product from others." *Id.,* n.3. "The value of the mark ... is largely determined by its connotation of a single source who stands behind the product." *Id.* at 858.

Here plaintiff's loss of the public's confidence, or "goodwill", as the result of trademark infringement is at issue. Irreparable harm resulting from lost goodwill does not require a showing of confusion as to the origin of goods, or of injury to plaintiff's reputation caused by inferior goods sold under plaintiff's mark. Plaintiff's goodwill

can be harmed even by the defendant's sale of goods that are identical to those sold by plaintiff. *Id.* at 859.

Plaintiff lacks the ability to control the nature and quality of defendant's goods sold under the infringing mark, even if defendant matches the quality of plaintiff's product. This constitutes irreparable harm. *Fotomat Corp. v. Photo Drive-Thru, Inc.,* 425 F.Supp. 693, 711 (D.N.J. 1977), *citing Ambassador East, Inc. v. Orsatti, Inc.,* 257 F.2d 79, 82 (3d Cir.1958); *Chips n' Twigs, Inc. v. Chip-Chip, Ltd.,* 414 F.Supp. 1003, 1018 (E.D.Pa.1976); *See also Franklin Mint, Inc. v. Franklin Mint, Ltd.* 331 F.Supp. 827, 830 (E.D.Pa. 1971) ("By depriving plaintiff of the ability to control the nature and quality of defendant's goods, defendant inflicts serious harm upon plaintiff. This deprivation, without more, constitutes irreparable injury.") (citation omitted).

Even if plaintiff were to receive some benefit from the public's association of its product with the more popular "Banquet" line of frozen foods, plaintiff could suffer loss of goodwill if consumers think that it is trying to trade on defendant's rights. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir. 1977), *cert. denied* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

The Court concludes that plaintiff has made a sufficient showing of irreparable harm for a preliminary injunction to issue.

## C. *Harm to Others and the Public Interest*

█ Enjoining only defendant from trademark usage of the term "side dish" for its line of frozen food products would not take the word out of circulation. Anyone, including defendant, can still use the term in a good-faith, non-trademark sense, or even in a trademark sense, as long as there is no likelihood of confusion. The public interest lies in both the continued non-infringing use of the term "side dish"

as well as in open and fair competition in the marketplace—competition that does not involve infringement upon plaintiff's trademark and its twenty years of accumulated goodwill.

## III. CONCLUSION

█ Plaintiff has met the requirements for the Court to preliminarily enjoin defendant from using the term "Side Dish for One" in a trademark sense.[4] Defendant asserts that a nationwide recall of its "Side Dish for One" line in conjunction with a preliminary injunction would cost it hundreds of thousands of dollars. The Court will not enter such an order, but instead will require defendant to recall and remove from distribution packages of its "Side Dish for One" line of frozen foods, and to refrain from selling those products under that mark, *only* in those areas in which plaintiff sells its "Side Dish" frozen stuffed potatoes.

Defendant can redistribute these products, and continue to sell them under the "Side Dish for One" mark, in geographic areas in which plaintiff does not sell its product. Defendant also can continue to advertise its product nationally. Although this remedy will diminish the effectiveness of defendant's national marketing strategy, it eliminates the likelihood of confusion and irreparable injury that plaintiff otherwise would suffer.

An order will enter in accordance with this opinion, which constitutes the Court's findings of fact and conclusions of law in conformity with Fed.R.Civ.P. 52(a).

---

**4.** The Court need not consider plaintiffs unfair competition and common law claims at this time.