**TOOTSIE ROLL INDUSTRIES, INC., Plaintiff,**

v.

**SATHERS, INC., Defendant.**

**Civ. A. No. 87–75 LON.**

United States District Court, D. Delaware.

Feb. 19, 1987.

Allen M. Terrell, Jr., and Helen L. Winslow, of Richards, Layton & Finger, Wilmington, Del., for plaintiff.

## OPINION

LONGOBARDI, District Judge.

It is unexpected that lawsuits could be engendered by soft, chewy, chocolaty Tootsie Rolls but the corporate quest for the "bottom line" brings reality to a seemingly frothy and amusing dispute over mere candy. But, the apparent life's blood of this

corporation is the public's appetite for Tootsie Rolls and any threat to that market imperils an otherwise healthy corporate life.

Tootsie Roll Industries, Inc. ("Tootsie Roll") has moved the Court for a temporary restraining order enjoining and restraining Sathers, Inc. ("Sathers") from using any trade dress or trademark that is confusingly similar to the well known brown, red [1] and white wrapper design employed by Tootsie Roll. That trade dress has been used extensively by Tootsie Roll since the early 1960s, Docket Item ("D.I.") 1, ¶ 5, and is registered as United States Trademark Registration No. 1,324,905, which issued on March 12, 1985. *Id.*, ¶ 13.

Jurisdiction is based on an alleged violation of federal law with pendent jurisdiction over a State law claim. *See* 28 U.S.C. § 1338. Additionally, because Tootsie Roll is a Virginia corporation with its principal place of business in Illinois and Sathers is a Delaware corporation with its principal place of business in Minnesota, there is diversity of citizenship, *see* 28 U.S.C. § 1332, and venue is proper in this Court. *See* 28 U.S.C. § 1391(c). Tootsie Roll avers that the amount in controversy is well in excess of $10,000.

## I. FACTS

The familiar Tootsie Roll bite size, chewy, chocolate candy product has been marketed continuously since before the turn of the century. Since the early 1960s, Tootsie Roll has adopted and extensively used its well known package which consists of a wrapper with a brown center bordered on each side with a parallel thin red stripe and a white outer panel. The word trademark "Tootsie Roll" appears on the brown panel. This wrapper is placed around the candy and twisted at each end. Since 1947, Tootsie Roll has packaged the candy at issue—the "Midgee"—in the same wrapper.[2]

Sathers has been a customer of Tootsie Roll for "many years" and has purchased substantial lots of Midgees. According to Tootsie Roll, the annual sales of Midgees to Sathers is on the order of $2,000,000, including 1,500,000 pounds of candy wrapped in the Tootsie Roll wrapper. Sathers rebags the candy alone or in a package containing other brands of candy which are sold on pegboards and similar displays in retail outlets.

In early February, Tootsie Roll learned that Sathers was substituting its own candy product known as Snippits with a wrapper similar to the Tootsie Roll wrapper in these mixed bags.[3] Tootsie Roll alleges that Sathers sells the mixed bags containing the Sathers product and other candy products on the same displays that it sells mixed bags containing Tootsie Roll Midgees.[4] Hence, Tootsie Roll contends that there is a substantial likelihood of confusion and a damage to its reputation when consumers purchase the Sathers candy. Further, the mixed bag packaging does not promote full visibility.

## II. STANDARDS FOR GRANTING A TEMPORARY RESTRAINING ORDER

Tootsie Roll has certified that counsel for Sathers was given notice of the instant

---

**1.** The United States Trademark Registration categorizes this color as orange but Tootsie Roll prefers to view it as closer to a shade of red. *See* D.I. 1, p. 13.

**2.** This trade dress has now come to be used on a variety of Tootsie Roll products and display containers and for four years has been used as the house logo of Tootsie Roll.

**3.** According to Tootsie Roll, the following features of the Snippits wrapper are similar to the Tootsie Roll wrapper. The Court has had the opportunity to inspect both products and concurs in the statement of similarity: (1) wax paper wrapper for cylindrical, bite-size candy;

(2) use of a brown center panel; (3) parallel thin red (or orange) stripes on either side of the brown panel which substantially define the ends of the candy; (4) white panels on the outer side of the red panel; (5) word mark printed on brown panel in white; (6) printing of contents on white panel parallel to the red stripes (although in a different color than used by Tootsie Roll); (7) printing of corporate name on the opposite white panel (although in a different color); and (7) twisting the wrapper at the white panels. D.I. 1, ¶ 21.

**4.** Additionally, an advertisement indicates that Sathers is selling bags of Snippits. D.I. 1, Exhibit 34.

action prior to its filing. D.I. 4. Because Sathers was not present when Tootsie Roll presented its argument and hence has had no opportunity to be heard, the Court will apply the procedure set forth in Rule 65(b) of the Federal Rules of Civil Procedure. Although by its terms that Rule applies when the adverse party has *not* received notice, its logic is applicable to the instant situation. *Accord* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2951 (ten day time limitation, in particular, should be adhered to if no argument was heard on the motion for temporary restraining order).

■ Generally speaking, courts apply the standards for granting a preliminary injunction in determining the propriety of issuing a temporary restraining order. The Court must consider whether (1) the movant has shown that there is a reasonable likelihood that it will succeed on the merits; (2) the movant has demonstrated that it will suffer irreparable harm absent the relief sought;[5] (3) other parties will be substantially injured by the relief; and (4) where the public interest lies. *See, e.g., Premier Dental Products v. Darby Dental Supply Co.,* 794 F.2d 850, 852 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986) (citing *Commonwealth of Pa. v. United States,* 469 F.2d 1387, 1388 (3d Cir.1972) (per curiam)); *see also Tree Tavern Products, Inc. v. Conagra, Inc.,* 640 F.Supp. 1263, 1265 (D.Del. 1986); *Norfolk Southern,* 594 F.Supp. at 519; *Mesa Partners v. Phillips Petroleum Co.,* C.A. No. 84–718 LON, slip op. at 3 (D.Del. Dec. 7, 1984).

Because temporary restraining orders and preliminary injunctions are extraordinary remedies, they are sparingly granted and only after a strong showing of necessity. *See Norfolk Southern,* 594 F.Supp. at 519 (citations omitted). The function of the temporary restraining order is to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction. *See* 11 C. Wright & A. Miller § 2951.

After a careful consideration of the facts of the case as stated in Tootsie Roll's motion in light of these four standards, I conclude that Tootsie Roll is entitled to a temporary restraining order to maintain the status quo pending full consideration of its application for a preliminary injunction.

**1. Reasonable Likelihood of Success on the Merits**

Tootsie Roll has alleged four separate violations by Sathers: (1) common law trademark infringement; (2) common law trade dress infringement; (3) a violation of section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a); and (4) a violation of the Delaware Trademark Act, 6 Del.C. §§ 3313, 3314. Because the Court finds that Tootsie Roll has established a substantial likelihood of success on the merits with respect to the Lanham Act claim and is entitled to a temporary restraining order on that basis alone, the Court need not consider whether Tootsie Roll has demonstrated a likelihood of success on its other claims.

■ Section 43(a) of the Lanham Act prohibits unprivileged imitation or infringement of a protected trade dress. *American Greetings Corp. v. Dan-Dee Imports, Inc.,* 807 F.2d 1136 (3d Cir.1986). Trade dress represents the "total image of a product and may include features such as size, shape, color or color combinations, texture, graphics or even particular sales techniques." *Ambrit, Inc. v. Kraft, Inc.,* 805 F.2d 974, 978 (11th Cir.1986); *see also American Greetings,* 807 F.2d at 1140–41. In order to be successful in a claim of trade dress infringement under the Lanham Act, Tootsie Roll must establish that: (1) its trade dress is non-functional; (2) its trade dress has acquired secondary meaning; and (3) members of the consuming public are likely to confuse the source of the

---

5. As this Court has previously noted, the term "irreparable injury" is something of a misnomer because irreparability is only a part of the inquiry. Plaintiff must also show that the injury is "special, peculiar or work[s] an onerous hard-

ship." *Norfolk Southern Corp. v. Oberly,* 594 F.Supp. 514, 519 (D.Del.1984) (quoting *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola,* 563 F.Supp. 1122, 1141 (D.Del.1983)).

product bearing the imitating trade dress with the source of the product bearing the imitated trade dress. *American Greetings*, 807 F.2d at 1141. In the instant case, the Court finds that Tootsie Roll has demonstrated a substantial likelihood of success in proving each of the required elements of a Lanham Act violation.

In order to be entitled to protection under the Lanham Act, Tootsie Roll's trade dress, discussed *supra* at page 657, must be "non-functional." The essence of the question is whether a particular feature of a product (*e.g.*, its "trade dress") is part of the "function" served by the product "or whether the primary value of a particular feature is the identification of the provider." *American Greetings*, 807 F.2d at 1142 (quoting *United States Golf Assn. v. St. Andrews Systems*, 749 F.2d 1028, 1033 (3d Cir.1984)). On the basis of the present record, the Court believes that Tootsie Roll will likely be successful in establishing that its trade dress is non-functional.

The Court is also persuaded, based on the present record, that Tootsie Roll will likely succeed in demonstrating that its trade dress has acquired "secondary meaning." In order to establish secondary meaning, Tootsie Roll is required to show that the primary significance of its trade dress is "to identify the source of the product rather than the product itself." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir.1982) (quoting *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). Factors relevant to such an inquiry include the length of use, buyer association, extent of sales and advertising and the fact of copying. *Id.*

■ The final requirement that a party must satisfy in order to succeed in a claim of trade dress infringement under section 43(a) of the Lanham Act is to demonstrate a likelihood of confusion arising from the use of a trade dress similar to its own. *Ambrit*, 805 F.2d at 974. The Court is satisfied, based on the record before it, that Tootsie Roll would likely be successful in demonstrating that Sathers' use of a trade dress substantially similar to Tootsie Roll's would generate confusion in the marketplace. A visual inspection of the wrappers used by Tootsie Roll and Sathers reveals that they are substantially identical. The design, coloring, configuration and texture of the wrappers are virtually the same. When the wrappers are placed around the candies, the ends of the wrappers are twisted in what appears to be an identical fashion. The combination of these factors taken together compels the conclusion that the "total image" of the wrapped candies is such that there is a substantial likelihood of consumer confusion.[6]

■ Moreover, "a court must consider how the trade dress would function in the actual marketplace." *Id.* at 984. It is critical, therefore, to recognize that candies such as those at issue here are not expensive items of commerce which are purchased only after careful thought, deliberation and inspection. Instead, the items in question are "impulse items" frequently purchased by harried shoppers. *See Ambrit*, 805 F.2d at 985. In such a context, the likelihood of confusion is substantial.

Not only are the wrappers identical in many respects but the candies themselves are substantially similar in appearance. This similarity between the underlying products augments the Court's conclusion

6. The Court is mindful that the wrappers are not identical in every respect. The words "Snippits" and "Sathers" appear in the brown center panel of Sathers' wrapper, while "Tootsie Roll" is imprinted in the same location on Tootsie Roll's label. The presence of these words alone, however, does not dispel the conclusion that the similarity of the wrappers will result in confusion. Similarity of design involves an inquiry into the *overall* similarity of the products. *Ambrit*, 805 F.2d at 984. The words appearing on the wrappers must, therefore, be considered not in isolation but in the context of the overall trade dress. *Id.*

A second difference is that Sathers uses a different color to print the corporate name and a list of ingredients on the ends of its wrappers. This does not alter the Court's conclusion because, when the candies are wrapped, the ends become twisted and the printing in question is not even visible to the consumer.

that confusion and dissatisfaction in the marketplace is likely.

This likely conclusion is further buttressed by the manner in which the wrapped candies are packaged and merchandised. Pursuant to a licensing agreement, Sathers purchases carload lots of Tootsie Roll's "Midgee" candies. It then repackages these candies alone or in combination with other types of candy. The latter packaging and merchandising method yields a product labeled as "Kiddie Mix." "Kiddie Mix" is sold in a 5½ ounce plastic package. The plastic package contains yellow, red and white stripes. The package also contains a clear plastic window through which the individually wrapped candies are visible.

Sathers recently began processing "Kiddie Mix" packages which contain not individually wrapped "Tootsie Roll" candies but individually wrapped "Snippits" candies instead. The "Kiddie Mix" packages containing "Snippits" are identical in appearance to the "Kiddie Mix" packages containing "Tootsie Roll" candies which were described above. Thus, in order to determine whether a "Kiddie Mix" package contains "Snippits" or "Tootsie Roll" candies, a customer must inspect the package through the clear plastic window, distinguish the "Snippits" or "Tootsie Roll" candies from the other candies in the package and decipher the writing on each individual candy. This packaging and merchandising technique tends to increase the potential for confusion.

■ I conclude, therefore, that Tootsie Roll would likely succeed in establishing that Sathers' use of a trade dress substantially similar to Tootsie Roll's would generate confusion in the marketplace and that its trade dress is non-functional and has acquired secondary meaning. Hence, Tootsie Roll will likely prevail on the merits under section 43(a) of the Lanham Act.

**2. Irreparable Injury**

■ It is obvious that a trademark or trade dress is a symbol of public confidence

or "good will" in a given product. See id., 456 U.S. at 853, 102 S.Ct. at 2188, noted in Tree Tavern Products, 640 F.Supp. at 1272. Tootsie Roll contends that it will be irreparably harmed by the resultant loss of good will when consumers purchase Sathers candy in its similar wrapping. Tootsie Roll argues that because it is unable to control the nature and quality of Sathers' product, it will lose control over its reputation. See, e.g., Robb Container Corp. v. Sho-Me Co., 566 F.Supp. 1143, 1154 (N.D. Ill.1983).

Because good will is an intangible which includes public perception and confidence in the quality of a product as well as name recognition of that product, see Premier Dental, 794 F.2d at 853 n. 3, it is difficult to quantify the harm which would result to Tootsie Roll should the instant motion be denied. Tootsie Roll avers that it learned through a telephone conversation with counsel for Sathers that Sathers has already produced 250,000 pounds of product, as well as sufficient paper to wrap an additional 250,000 pounds of candy. D.I. 1, ¶ 25. Tootsie Roll calculates that 500,000 pounds of candy equates to 40,000,000 pieces of candy which could in turn be distributed in roughly 8 to 10 million bags of candy. Id. [7] Even assuming that these figures are inflated, it is clear that a substantial number of consumers could be confused or deceived before a decision on the preliminary injunction.

I have concluded, supra, that the Sathers wrapping is likely to confuse consumers. Irreparable injury is established if there is a likelihood that an appreciable number of customers will be misled or simply confused by the Sathers product. See, e.g., Church of Scientology Intern. v. Elmira Mission, 794 F.2d 38, 41–44 (2d Cir.1986); Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62, 66 (2d Cir.1985); Parkway Baking Company v. Freihofer Baking Company, 255 F.2d 641, 649 (3d Cir.1958); Teledyne Indus. v. Windmere Products, Inc., 433 F.Supp. 710, 740 (S.D.

---

**7.** In the past two years, Tootsie Roll has sold over 4 billion Midgees. D.I. 1, ¶ 6. Hence,

40,000,000 pieces amounts to roughly 2 percent of the average yearly Midgee sales.

Fla.1977). To prove irreparable injury under section 43(a), Tootsie Roll need only provide a reasonable basis for belief that it is likely to be damaged by the confusing wrapper. *Accord Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1244 (D.Del.1986) (false advertising case) (citing *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 190–91 (2d Cir.1980)). Further, no proof of actual diversion of sales need be tendered. *Id.*

Upon this record, I conclude that Tootsie Roll has demonstrated that it will likely be irreparably harmed from a special hardship should the temporary restraining order not be granted.

**3. Substantial Injury to Sathers**

 While the *ex parte* nature of the proceeding necessitates that the Court engage in speculation regarding the injury to Sathers, I am confident that granting a temporary restraining order will not substantially injure Sathers. The wrapped candy and the wrappers will remain in Sathers' possession pending resolution of the motion for a preliminary injunction. Indeed, apparently Sathers could continue production of the product. Should Sathers prevail on the merits, it could market the wrapped candy [8] and use the already printed wrappers. Conversely, should Tootsie Roll prevail, Sathers could market the product under a different wrapper. *Accord Bill Blass, Ltd. v. SAZ Corp.,* 751 F.2d 152, 156 (3d Cir.1984). Additionally, preventing the further shipment of the product at the present time will protect Sathers from having to "unscramble the eggs" should it ultimately lose on the merits. Recalling the candy could prove costly and time consuming.

**4. Public Interest**

Two strong public interests are implicated in this case. First, the public has an interest in protecting business good will. Second, there is a public interest in fostering open and fair competition. The former allows consumers to garner a degree of knowledge about products in the market and fosters a sense that they "know what they are getting" when they buy a given product. Indeed, the Seventh Circuit has indicated that the likelihood of confusion by the public as to whether it is receiving the desired product is an important public interest consideration. *Accord A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 909 (7th Cir.1986) (trademark appeared valid). The latter is obviously a central feature of our economic system.

In the instant case, the public interest in protecting good will is furthered by granting the temporary restraining order. Additionally, because it is of a limited duration, should Sathers ultimately prevail, open and fair competition will not be substantially injured by the temporary restraining order. Conversely, should the Court deny the instant motion and Tootsie Roll prevail on the merits, both public interests would be injured. Tootsie Roll's good will could be harmed and unfair competition fostered.

I, therefore, conclude that the public interest will be furthered by granting the temporary restraining order.

---

**8.** The Court assumes that the shelf life of the candy at issue is longer than 10 days. Sathers can certainly apply for modification of the Order should that assumption be inaccurate.