**STORCK USA, L.P., and August Storck K.G., Plaintiff,**

v.

**FARLEY CANDY COMPANY, INC., Defendant.**

No. 92 C 0552.

United States District Court, N.D. Illinois, E.D.

July 2, 1992.

Joseph F. Schmidt, Larry L. Saret, Louis Altman, John T. Gabrielides, Laff, Whitesel, Conte & Saret, Chicago, Ill., for plaintiffs Storck USA, L.P. and August Storck K.G.

Alan S. Cooper, Kathy J. McKnight, Mary Gronlund, Banner, Birch, McKie & Beckett, Washington, D.C., James D. Adducci, Jeffrey E. Schiller, Schuyler, Roche & Zwirner, Chicago, Ill., for defendant Farley Candy Co., Inc.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs Storck USA, L.P. and August Storck K.G. ("Storck") have moved for a second preliminary injunction enjoining Farley Candy Co. ("Farley") from using any trade dress which is confusingly similar to the trade dress of the package and individual-piece wrapper of Storck's Werther's Original butter candy.

## FACTS

Since 1980, Storck has continuously distributed Werther's Original packaged hard butter candy. From 1980 to 1988, the 8–ounce bag of Werther's Original had a dark brown background, a picture of a mound of unwrapped candy on the front and back panels, and a design in the lower right corner of the front panel of a village and an old-fashioned container pouring a white liquid. (Supp.Complaint, ¶ 6; Supp.Harshman Decl., Ex. A.)

In May 1988, Storck revised its Werther's Original package by using a 7–ounce bag, changing the background color of the bag to blond and enlarging, relocating and modifying the village design by, *inter alia*, placing in the foreground two brown pitchers pouring white liquid into a merged stream. The village design is roughly oval in shape and has a bright blue sky behind a village scene of white, red and brown colored buildings. The village design is positioned in the left center portion of the front panel of the Werther's Original package. A picture of a mound of the unwrapped butter candy covers most of the lower third of the front panel. The mound of candy extends around to the back panel where it is interrupted by a clear window which reveals the candy pieces inside the package individually wrapped in gold-colored foil. (Supp.Complaint, ¶ 4; Pl.Ex. 1.) *See* Figure 1.

**Figure 1**
**Storck's Werther's Original 7-ounce bag**
**(front view)**

Defendant Farley presently markets its butter toffee candy in a bag (Pl.Ex. 275) which contains the same amount of candy by weight (7 ounces) and has the same shape (rectangular) as the bag used by Storck for its Werther's Original candy. The background color of Farley's bag is a muted yellow. A clear window in the lower right corner of the front panel displays the candy inside the bag, each piece of which is individually wrapped with gold-colored foil. A mound of unwrapped candy appears in the lower left portion of the front panel. Farley's package has an oval design located in the left center portion of the front panel. The Farley oval design is approximately the same size as the Werther's Original village design. The Farley oval design depicts a brown milk can and a lighter brown long-handled butter churn against a blue background. (Pl.Ex. 275.)

Prior to this court's preliminary injunction of January 31, 1992, the oval design on the Farley's Butter Toffee bag, in addition to the elements described above, depicted a pair of containers, set against a green and blue background, pouring their white and off-white liquid contents into a merged stream onto the mound of unwrapped candy positioned in the lower left portion of the front panel. (Pl.Ex. 2.) *See* Figure 2.

**Figure 2**
**Farley's Butter Toffee 7-ounce bag**
**prior to January 31, 1992 Order**
**(front view)**

---

After the court's January 31, 1992 preliminary injunction order, 785 F.Supp. 730, Farley altered its oval design by eliminating the pouring pitchers and the merged stream of creamy liquid. Farley also changed the background color of its oval design from green and blue to a solid bright blue color that is almost identical to the Werther's Original blue sky color of its village design. All other aspects of the Farley Butter Toffee bag remained the same after this court's January 31, 1992 Order. This modified bag is the trade dress of the Farley Butter Toffee candy at issue here. (Pl.Ex. 275.) *See* Figure 3.

**Figure 3**
**Farley's Butter Toffee 7-ounce bag**
**after January 31, 1992 Order**
**(front view)**

In addition to the 7-ounce bag (Pl.Ex. 275), Farley also packages its butter toffee in a 12-ounce carton (Pl.Ex. 276), a 12-ounce tub (Pl.Ex. 277), and three 40-ounce "club" bags (Pl.Exs. 278, 303, 304). All but one of the "club" bags feature a yellow background and the oval design and mound of unwrapped candy described above.

Within the Storck's Werther's Original and Farley's Butter Toffee packages are individually wrapped pieces of candy. The Werther's Original wrapper, which has been used by Storck since 1980, is primarily a gold-colored foil with white printing[1] of a pitcher and flowers and the words "Werther's Original" and "Werther's Echte."[2] The twisted portions of the wrapper at either side of the gold foil portion are made of clear yellow plastic. (Pl.Mem. in Support, Ex. PX 17.) The wrapper used by Farley for individual pieces of its butter toffee is also a gold-colored foil with white printing[3] of the words "Farley's Butter

1. Although the parties refer to the printing on the Storck gold wrapper as white, the court believes that it is more accurately described as cream-colored.

2. "Echte" is a German word which is equivalent to the English word "Original."

3. Once again, the parties refer to the printing on the Farley gold wrapper as white. The court,

Toffee." The twisted portions of the wrapper are the same gold-colored foil. Adding to the similarity between the Storck and Farley wrappers is the almost identical size and shape of the candy pieces which they encase. (*Id.*)

This court's January 31, 1992 preliminary injunction order enjoined Farley from using any trade dress on its butter toffee candy package which is in any way similar to the pouring pitchers image in the oval village design used by Storck as trade dress for its Werther's Original candy. Following that order, Farley modified its butter toffee candy package by deleting the pouring pitchers and changing the background color in the oval design. On March 4, 1992, Storck filed a supplemental complaint asserting that Farley's modified package and individual candy wrapper infringe Storck's trade dress and trademark rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and that the modified package violates the Copyright Act, 17 U.S.C. § 101 *et seq.* Storck claims in its supplemented complaint that the changes made by Farley to the oval design on its butter toffee package are not sufficient to eliminate the likelihood of confusion created by the Farley's Butter Toffee trade dress. On this second motion for a preliminary injunction, Storck seeks to enjoin Farley from using any trade dress which is confusingly similar to its Werther's Original package and individual piece wrapper.

## DISCUSSION

■ Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: (1) they have no adequate remedy at law; (2) they will suffer irreparable harm if the injunction is not granted; and (3) they have *some* likelihood of success on the merits in the sense that their chances are better than negligible. *Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989) (emphasis in original). If the movant can meet this threshold burden, the inquiry then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Id.* In particular, and keeping in mind that the public interest may become important in a given case, the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor in order to get the injunction; the less likely he is to win, the more need the balance of harms weigh in its favor to be awarded preliminary injunctive relief. *Id. See National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1010–11 (7th Cir. 1990).

### I. LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. PACKAGE

■ "Trade dress" refers to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or other visual features. *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935–36 (7th Cir.1989). An infringement of trade dress is proven if: (1) the plaintiff's trade dress is inherently distinctive or has acquired secondary meaning,[4] (2) the plaintiff's trade dress is primarily non-functional, and (3) the defendant's trade dress is confusingly similar, engendering a likelihood of confusion in the marketplace.[5] *Id.; Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615, 52 S.Ct.Bull. (CCH) p. B3576–77 (1992).

---

however, believes that it is more accurately described as cream-colored.

4. The United States Supreme Court recently reaffirmed that "an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615, 52 S.Ct.Bull. (CCH) p. B3576 (1992) (emphasis in original).

5. Storck has brought its allegations concerning its 7–ounce bag of Werther's Original candy under several legal theories, including the Lanham Act and the Copyright Act. Because the court finds that Storck has established some likelihood of success on the merits with respect to its Lanham Act claim, and is entitled to a preliminary injunction on that basis alone, the court need not and does not address Storck's likelihood of success on its other claims.

The individual elements which, in total, comprise the trade dress of Werther's Original may be considered descriptive to varying degrees if taken individually. But,

> that is not the right way to take them. The eye sees the combination of words, typeface, and [illustration] as a unit. The perceptual gestalt may make one combination seem very like another—or very different—even though both have the same formal elements. The district court therefore must consider each mark as a unit.

*Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir.1985). That "unit" in this case is the product's trade dress—the overall image used to present the product to purchasers. *Spraying Systems Co. v. Delavan, Inc.*, 762 F.Supp. 772, 782 (N.D.Ill.1991). *See Roulo*, 886 F.2d at 936 (the fact that the greeting cards incorporated common, indistinct elements such as lines and handwriting does not refute the fact that plaintiff's combination of these elements was sufficiently unique to warrant trade dress protection). The overall image of the Werther's Original package includes, *inter alia*, the size and shape of the package, the colors used for the various elements of the package, the village design, the mound of unwrapped candy, the words describing the product, the typeface of the product's appellation, and the location and layout of these elements on the front and back of the package.

▇ Although Farley has complied with the court's preliminary injunction order of January 31, 1992, in which the court found the village design image to be distinctive and arbitrary, Farley has an ongoing duty to select a trade dress which would avoid all possibility of confusion. *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1124 (7th Cir.1988). Since the court has previously enjoined Farley from infringing the Werther's Original trade dress, Farley will not be accorded the same leniency that the court previously afforded Farley in making its earlier determination. *See id.*

The court believes that the Werther's Original trade dress is inherently distinctive. Although various elements of the trade dress may be merely descriptive or even functional, the overall appearance of the Werther's Original package, including the layout of the trade dress elements, creates a distinctive and arbitrary visual impression. Isolated or piecemeal third party uses of various elements of the Werther's Original trade dress—such as a clear window or blond package coloring—do not detract from the distinctiveness of the overall impression conveyed by the combination of those elements on the Werther's Original package. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537 (11th Cir.1986). Farley has not demonstrated that any third party candy package incorporates a combination of trade dress elements that is at all similar to the unique impression conveyed by the Werther's Original trade dress. *See id.*

▇ The court also believes Storck has demonstrated the existence of secondary meaning for the trade dress of its Werther's Original package. Secondary meaning denotes an association in the mind of the consumer between the trade dress of a product and a particular producer. *Spraying Systems*, 762 F.Supp. at 778. To establish secondary meaning, it is not necessary that the public be aware of the identity of the producer, but simply that the public associate the trade dress with a single source. *Roulo*, 886 F.2d at 936. Factors relevant to establishing secondary meaning include the amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony, and consumer surveys. *Spraying Systems*, 762 F.Supp. at 778.

In the past three years, Storck has expended over $17 million promoting and advertising its Werther's Original product. (First Harshman Decl., ¶ 8.) Television has played a significant role in the advertising campaign for Werther's Original, including local, network, and cable television commercials. (*Id.*) These commercials have repeatedly focused the viewers' attention on the appearance of the Werther's Original package. (*Id.*, Ex. 3.) Storck also advertises Werther's Original in nationally-circulated trade publications, newspapers,

point-of-sale materials, and at trade shows. (First Harshman Decl., ¶ 8.) Many of these promotional efforts display the Werther's Original package or elements of its trade dress, such as the oval, blue-sky village design, the mound of unwrapped candy, and the product's name in a particular typeface. (*Id.*, Exs. 4, 5.)

The success of Werther's Original candy is evident in the volume of sales it has attained of more than $100 million over the past three years. (*Id.*, ¶ 9.) Since the last quarter of 1989, Werther's Original has been the market leader in the packaged hard sugar candy category. (*Id.*) Product ranking reports from retail scanning data show that (1) Werther's Original outsold the second ranking hard candy by over three times in terms of dollar sales for the four-week period ending December 1, 1991, and (2) Werther's Original was ranked first for all bagged candy in the 5 to 11.9–ounce category for the twelve-week period ending November 3, 1991. (*Id.*, Ex. 6.) Currently, Werther's Original outsells the second ranking hard candy by four times. (Testimony of Richard Harshman, President of Storck, Hearing of June 30, 1992.)

Storck has continuously used the current package for Werther's Original since May 1988. (First Harshman Decl., ¶ 7.) The current package incorporates several of the elements from the preceding package, which has been used since 1980. The use of seasonal bags by Storck for its Werther's Original candy (*see e.g.*, Supp.Harshman Decl., Ex. B4; Def.Ex. 16) in addition to the traditional bag at issue here does not appreciably affect the strength of the secondary meaning of the traditional bag's trade dress. First, Storck has engaged in the practice of using seasonal bags only occasionally. Secondly, the seasonal bags have always been marketed *in addition* to the traditional bag, and thus have never replaced the traditional bag. Thirdly, the most conspicuous elements of the traditional bag's trade dress—such as the village scene with the pouring pitchers and the mound of unwrapped candy—have ap-

peared on the seasonal bags in the same locations as they appeared on the traditional Werther's Original bags. (*Cf. id.* to Pl.Ex. 1.) (*Id.*, ¶ 6.) Storck has presented substantial evidence of the existence of secondary meaning of the Werther's Original trade dress. Thus, it is unnecessary for the court to consider Storck's consumer survey purporting to evidence secondary meaning.[6]

■ As stated above, trade dress must be primarily nonfunctional to be eligible for protection under the Lanham Act. A functional feature "is one that competitors would find necessary to incorporate into their product in order to compete effectively." *Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 349 (7th Cir.1987). The only features of the Werther's Original package which may be considered functional are the mound of unwrapped candy displayed on the front and back panels and the clear window on the back panel. Both of these elements allow consumers to view the contents of the package. However, it is improper to focus on the functionality of the individual elements of the trade dress rather than functionality of the overall arrangement of these elements. *Id.* at 350. Farley makes no contention, nor could it reasonably do so, that the overall trade dress of the Werther's Original package is functional.

■ Once a trade dress is found to be nonfunctional and to warrant protection due to its distinctiveness or secondary meaning, the plaintiff must establish that the defendant's trade dress is sufficiently similar to create a likelihood of confusion. *Roulo*, 886 F.2d at 937. In assessing the likelihood of marketplace confusion, the factors to be considered include the similarity of the trade dresses, the similarity of the products to which those trade dresses are attached, the area and manner of concurrent consumer use, the degree of care likely to be exercised by consumers in making their purchasing decision, the strength

---

6. Moreover, Storck's consumer survey demonstrating secondary meaning for the Werther's Original package (Second Lavidge Decl., Ex. G) is of questionable probity. *See* discussion *infra* p. 1412.

of plaintiff's trade dress, actual confusion among consumers, and the intent of the alleged infringer to pass off the infringer's goods as those of the plaintiff. *Id.*

To properly evaluate similarities, the court must compare the marks in light of what occurs in the marketplace, and not the courtroom. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976). Where the trade dress relates to similar products which are sold in close proximity in retail outlets, a direct visual comparison is appropriate. *Roulo*, 886 F.2d at 937. A side-by-side comparison of the Farley's Butter Toffee 7–ounce package and the Werther's Original 7–ounce package demonstrates substantial similarities. Both trade dresses have a yellowish blond background, an illustration of a mound of unwrapped identically-shaped candy pieces along the front bottom edge, and an oval-shaped design of vivid colors (especially the blue background) in the left center portion on the front of the package. The bags are virtually the same size and shape, with artwork and copy displayed horizontally along the longest dimension of the package. Storck's words "Werther's Original" and Farley's words "Butter Toffee" are printed in the upper left quadrant of the front panels on two lines and in similar typeface, under which Storck's words "The classic candy made with real butter and fresh cream" and Farley's words "Hard candy made with real butter and cream" are printed in similar typeface.

The consumer surveys submitted by the parties, which had not been conducted at the time of the first preliminary injunction, provide significant evidence of the likelihood of consumer confusion created by Farley's Butter Toffee package. (*See* First and Second Lavidge Decl., Ex. B, E.) The survey results have caused the court to reconsider the likelihood of confusion stemming from aspects of the Farley's Butter Toffee trade dress other than the now deleted pouring pitchers image discussed above and in the court's previous opinions. Further analysis of the trade dress in light of the surveys submitted persuades the court that Farley is continuing to infringe the trade dress of the Werther's Original package.

In Storck's candy package confusion survey, respondents were shown a 7–ounce package of Werther's Original and, in a second room, were asked to compare packages of four brands of candy, one of which was Farley's Butter Toffee, to the Werther's Original package seen in the first room. For each of the four packages, the respondent was asked, "Do you think candy number ___ is made by the same company as the candy I showed you a minute or two ago in the other room, or do you think it is made by a different company?" Whenever a respondent thought a brand of candy was made by the same company as the candy seen in the first room, the respondent was asked, "What is it that makes you think candy number ___ is made by the same company as the candy I showed you in the other room?" (*Id.*)

In the first Storck package confusion survey, 48 percent of the respondents said they thought Farley's Butter Toffee was made by the same company as Werther's Original. (First Lavidge Decl., Ex. B.) No more than sixteen percent of the respondents believed any one of the other three brands was made by the same company as Werther's Original. (*Id.*) Farley contends that Storck's survey is biased because its methodology of displaying the four brands simultaneously suggests to the respondent that one of the four is the "right" answer, and the Farley's package is most likely to be selected as the "right" answer because it appears most similar to the Werther's Original package and most dissimilar to the other three packages.

The bias from this methodology, however, would be minimal. First, it is actually probative of the similarity of the trade dresses and thus the likelihood of confusion that the Farley's package may have been found most similar to the Werther's Original package by respondents selecting the "right" answer. Secondly, the court believes the "Callard & Bowser Celebrated Butterscotch" 3.5–ounce thin box is the most dissimilar to the other three packages

because the other three packages, including Farley's Butter Toffee, are 7 or 7.5-ounce bags.

In response to Farley's criticism of the survey, Storck performed a supplementary candy package confusion survey. (Second Lavidge Decl., Ex. E.) In this survey, the respondent, after viewing the Werther's Original package, viewed each of three brands separately, i.e., not simultaneously. Moreover, in addition to Farley Butter Toffee, one other brand used in the survey was a butter toffee candy. This methodology eliminated the "right answer" bias and the arguable distinctiveness of Farley's product. Thirty-four percent of the respondents said they thought Farley's Butter Toffee was made by the same company as Werther's Original. (*Id.*) No more than ten percent of respondents believed any one of the other two brands was made by the same company as Werther's Original. (*Id.*) Thus, while some bias may have existed from simultaneously showing the four packages in the first package confusion survey, that bias could not account for the fact that Farley's package was selected by more respondents than the packages of the other three brands in total. The court finds Storck's package confusion surveys probative of whether the trade dress of Farley's Butter Toffee is sufficiently similar to the trade dress of Werther's Original to create a likelihood of confusion.[7]

Marketplace factors enhance the potential confusion to the consuming public. Farley competes directly with Storck by selling its butter toffee candy in the same or similar retailers as Storck's Werther's Original butter candy.[8] Several of Storck's top customers are customers to which Farley sells its butter toffee candy. These competing products are displayed in close proximity to one another by retailers. The

substantial visual similarity cannot be underestimated given that these products are impulse purchase items, sold at a relatively inexpensive price, and likely to be marketed near each other. In fact, candy products are arguably one of the strongest impulse items on the market. Thus, little careful or reflective thought and deliberation go into such a purchase. *See AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 984–85 (11th Cir. 1986); *Tootsie Roll Industries, Inc. v. Sathers, Inc.*, 666 F.Supp. 655, 659 (D.Del. 1987). Moreover, as discussed above, the strength of the Werther's Original trade dress is strongly evidenced by the amount and manner Storck has promoted Werther's Original and the volume of sales it has consistently achieved.

■ The court finds that evidence of Farley's intent to copy exists in light of the substantial similarities between the two trade dresses, the absence of competing brands with trade dresses similar to those at issue here, the unquestioned market leadership of Werther's Original candy,[9] and the method by which Farley selected the package for its butter toffee as discussed in this court's opinion of January 31, 1992. (*See* Mem.Op. at 10–11; First Raish Decl.) Farley, by using the current package for its butter toffee, is attempting to take advantage of the great value behind the strong trade dress of Werther's Original, "its primary competitor." (Farley Mem. in Opp., p. 12.) Farley's confusingly similar trade dress has a substantial likelihood of inducing consumers to select the Farley product when the customers meant to select the Storck product. *See Scandia*, 772 F.2d at 1430.

## B. WRAPPER

■ Farley claims that the trade dress of the individually wrapped Werther's Orig-

---

**7.** The court will not address the merits or value of Farley's "pilot test" of twenty-five consumers at one location. Even Farley's marketing expert who conducted the test concedes that "[b]ecause of the small size of the test and its limitation to one site, the results of the test are not projectable." (Rappeport Decl., ¶ 10.)

**8.** While Storck Werther's Original bills itself as a "butter" candy rather than a "butter toffee" candy, there is no dispute that these products

are very similar, compete directly, are marketed through the same channels, and are sold side by side in the candy section of the same retail stores. (*See* Edwards Decl., Ex. A.)

**9.** As the Seventh Circuit has stated, the more valuable the trade dress, the more other firms will be tempted to take a free ride. *Scandia*, 772 F.2d at 1430.

inal candy pieces is not relevant to consumer confusion of Werther's Original at the point of sale. The wrapped candy, however, is part of the trade dress of the Werther's Original package at the point of sale because it is visible through the clear window on the back of the package. Similarly, the individually wrapped pieces of Farley's Butter Toffee are visible through the clear window on the front of its package.[10] Several respondents to Storck's survey noted the wrappers of the individual candies when examining the bags of the two products and explaining why they believed Farley's Butter Toffee is made by the same company as Werther's Original. Thus, the gold foil wrapper of the individual pieces of Werther's Original candy is part of the total image of the Werther's Original product at the point of sale worthy of protection if found to be distinctive or possessing secondary meaning.

■ In any event, the Lanham Act is not limited to preventing confusion at the time of sale, but also to preventing confusion which occurs after the sale. *Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 821 (N.D.Ill.1990) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir.1986)). Storck provides persuasive survey evidence of the frequency in which consumers serve Werther's Original candies outside of the package itself. Approximately 64 percent of the respondents stated that they usually displayed individually-wrapped pieces of butterscotch or buttery-flavored hard candy in dishes or other containers outside of the packages in which they are sold. (Second Lavidge Decl., ¶ 9.)

■ Any attempt to obtain trade dress protection for the gold color of the wrapper must fail since the Seventh Circuit has determined that the overall color of a product cannot be a protected trade identity designation. *NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1027–28 (7th Cir.

1990). Thus, it is only the white-on-gold aspect of the wrapper for which Storck seeks protection.

■ In order to prove that the trade dress of its wrapper merits protection from infringers, Storck must show that the trade dress of the wrapper is inherently distinctive or has acquired secondary meaning. Storck has failed to show that the wrapper is are inherently distinctive. Factors to be considered in assessing the inherent distinctiveness of a trade dress include

> whether it [is] a "common" basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods....

*AmBrit*, 812 F.2d at 1536. Gold foil wrappers are frequently used in the candy industry to package individual pieces of hard candy. In fact, gold foil wrappers are commonly used for butterscotch, butter toffee, and other butter-flavored candy. (*See* Second Raish Decl., Exs. A–L; Supp.Raish Decl., ¶ 4; Def.Ex. 15.) Moreover, gold foil wrappers with clear plastic twisted ends, like Werther's Original's wrappers, have also been used by other butter candy producers.[11] (*See* Def.Ex. 15, Items C, E, G.) The quality image conveyed by the color gold and the likeness of gold to the color of most butter candies most likely accounts for this "commonly-adopted and well-known form of ornamentation." *See Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 7 (7th Cir.1950) (the use of color on candy label served the function of indicating what colors and flavors the candy package contained). The white printing on the Werther's Original wrapper cannot be considered a refinement of the common gold wrapper because numerous manufacturers who utilize gold candy wrappers also super-

---

**10.** Farley also displays several pieces of candy pieces individually wrapped in gold foil on its 12–ounce carton of butter toffee. (Pl.Ex. 276.)

**11.** Storck's use of clear yellow plastic twisted ends and Farley's use of gold foil twisted ends is an obstacle to a finding of likelihood of confusion. The court, however, need not address the likelihood of confusion with respect to the wrappers since Storck has not demonstrated distinctiveness or secondary meaning.

impose white printing on those wrappers. (*See* Def.Ex. 15, Items B, C, E, G, I, L.) The white-on-gold foil wrapper for individual pieces of Werther's Original candy is not distinctive as a matter of law.

Storck has also failed to persuade the court that the wrapper has acquired secondary meaning. Although Storck heavily advertises its Werther's Original product, any promotional emphasis on the foil wrappers addresses its gold color, and not the white-on-gold combination. The "Grandfather" television commercial most directly focuses the viewers' attention on the individual wrappers. (Tennant Decl., ¶ 7, Ex. A.) Even this advertisement, however, emphasizes the gold color, and not the white-on-gold combination.[12] Thus, while the amount of Storck's advertising weighs in favor of secondary meaning, the content of that advertising does not.

 Also relevant to secondary meaning are the volume of sales of the product and the length and manner of use of the trade dress. Storck does not sell its Werther's Original product in bulk. (Supp.Harshman Decl., ¶ 4.) Instead, the individual candies are sold to retailers and then to consumers in a sealed bag. Each sealed bag contains numerous pieces of individual candy pieces. Moreover, the clear window on the back of the 7–ounce bag of Werther's Original is the only portion of the package through which individual gold-wrapped pieces of the candy are visible. Thus, although sales of Werther's Original were in excess of $100 million from 1989 to 1991 and although Storck has used the white-on-gold wrappers since 1980 (Second Harshman Decl., ¶¶ 5–6), virtually all sales have been completed in a setting in which the white-on-gold aspect of the foil wrappers does not play a significant role.[13] *See*

*Tootsie Roll Indus., Inc. v. Sathers, Inc.,* 666 F.Supp. 655, 660 (D.Del.1987) (court notes difficulty in identifying source of product through clear plastic window of package). Market leadership or use of a particular trade dress over a substantial time period, even when coupled with extensive advertising, does not insure that every aspect of the product, no matter how material, has acquired a secondary meaning.

Storck submitted consumer letters to demonstrate consumer association between Storck and the white-on-gold wrapper of Werther's Original. (Second Harshman Decl., Ex. G.) The court sustained Farley's objection to the admission of these letters. However, even if the court were to consider the letters, they do not reveal secondary meaning. Consumer comments regarding the "gold wrapper" are not relevant to the wrapper's secondary meaning because, as ruled above, the court will not grant trade dress protection to the gold color of the wrapper. Only one of the letters mentions the white printing on the gold wrapper. This sole comment, even if admissible, is clearly insufficient to establish that the white-on-gold trade dress of the Werther's Original wrapper has acquired secondary meaning.

Storck also conducted a consumer survey to measure the secondary meaning of the wrapper trade dress. (First Lavidge Decl., Ex. D.) Survey respondents viewed three plates, each of which held individually wrapped pieces of one of three brands of butter candies, including Werther's Original.[14] For each brand, the respondent was asked, "Do you think pieces of butterscotch or buttery-flavored hard candy with wrappings that look like these are put out by one company or by more than one compa-

---

**12.** In the "Grandfather" commercial, the voice-over of the grandfather says, "I had a little trouble opening the shiny, golden wrapper ..." (Tennant Decl., ¶ 7, Ex. A.)

**13.** While there is evidence that some retailers break open bags of Werther's Original and sell it to their consumers in bulk, this is not a common occurrence and does not alter the court's finding that virtually all retail sales consist of the packaged product.

**14.** It was not improper, as Farley contends, that respondents were seated four feet from the individual pieces of candy. The purpose of this arrangement was to prevent respondents from reading the name of the product on the wrapper, thus turning this test of secondary meaning into a simple reading test. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 678 F.Supp. 1336, 1342 (N.D.Ill.1988) (secondary meaning test should not be merely a word association test).

ny?" Each respondent then explained his or her answer. (*Id.*)

Forty-six percent of the respondents viewing Werther's Original pieces answered that candies with such wrappers are put out by one company.[15] (*Id.*) This result is not a persuasive finding of secondary meaning. *See Spraying Systems Co.*, 762 F.Supp. at 779 n. 6 (citing 2 McCarthy, *Trademarks and Unfair Competition* § 32:54, at 785–86) (to prove secondary meaning, a substantial portion of buyers must associate the product with one source; generally over fifty percent is clearly sufficient and 38 percent would be marginal in a properly designed survey). In order to establish secondary meaning, a party must show that consumers associate its trade dress with the producer of the product rather than the product itself. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir.1986). The verbatim explanations from Storck's survey indicate that several respondents found the primary significance of the trade dress was to identify the product (butterscotch candy) and not the producer. This causes the court to believe that the percentage of respondents who actually associated the Werther's Original wrapper with one company was lower than the 46 percent proffered by Storck.

More basically, the survey itself is not probative of secondary meaning. Secondary meaning is a type of distinctiveness which is acquired over time as consumers associate a trade identity designation with a particular source. There is no evidence here that respondents had ever seen the Werther's Original product prior to this survey. In fact, the explanations provided by respondents who answered "one company" indicate that the survey question actually addressed the inherent distinctiveness of the products. Thus, the court does not consider the secondary meaning survey to be probative of secondary meaning since no aspect of the survey insured that what was being tested was acquired distinctiveness (i.e., secondary meaning) rather than inherent distinctiveness.

After consideration of various factors that tend to show secondary meaning, the court does not find that the white-on-gold wrapper of Werther's Original candy pieces has acquired secondary meaning. As discussed above, the court also finds that the wrapper is not distinctive. Consequently, Storck's likelihood of success on the merits of its trade dress claim for its gold foil wrapper is less than negligible. The wrapper is afforded no trade dress protection under the Lanham Act.

## II. REMEDY AT LAW AND IRREPARABLE HARM

Having held that Storck has a better than negligible chance of success on the merits of its package trade dress infringement claim, the court must consider other factors relevant to the issuance of a preliminary injunction. Damages occasioned by trademark or trade dress infringement "are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 858 (7th Cir.1982). "[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." *Ideal Indus., Inc. v. Gardner Bender*, 612 F.2d 1018, 1026 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Irreparable harm may result from the loss of goodwill in a given product. *Tootsie Roll Industries, Inc.*, 666 F.Supp. at 660.

In general, the extent of harm from infringement varies with the product and the sophistication of the market for that product. *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 392 (7th Cir.1985). As in this case,

> where the product involved was a low value item, the risk of confusion is greater "because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion; but rather they are likely simply to avoid all products produced by the company which they be-

---

**15.** The other two brands received responses of 37 percent and 22 percent.

lieved produced the product which caused the trouble."

*Id.* at 393 (quoting *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 383 (7th Cir.1976)). The relative unsophistication of the candy purchasing decision augments the degree of harm Storck will suffer from the trade dress of Farley's Butter Toffee. In addition, because both Storck's and Farley's products are butter candies, are sold in close physical proximity to one another in retail stores, and are impulse-purchase items, it is likely that an appreciable number of customers will be misled, causing irreparable harm. Furthermore, any loss of goodwill by Storck due to its inability to control the quality of Farley's candy is difficult if not impossible to quantify in monetary terms. *See id.* Thus, Storck does not have an adequate remedy at law.

## III. SLIDING SCALE

### A. BALANCE OF THE HARMS TO THE PARTIES AND THE PUBLIC

Storck has expended millions of dollars promoting its packages and trade designations in order to become the leader in its product category. In the past three years alone, Storck expended $17,000,000 promoting and advertising its Werther's Original candy. Storck's sales of the candy in the past three years have been in excess of $100,000,000. Werther's Original is one of only four candy products produced by Storck. Werther's Original, however, accounts for 85 percent of Storck's sales. (Testimony of Harshman, Hearing of June 30, 1992.) In contrast, Farley's Butter Toffee is one of "several hundred" candy products produced by Farley. Farley estimates that sales of its butter toffee will grow to 3 percent of Farley's sales in 1992. (Statements of Gary Ricco, Farley's Vice–President of Finance, Hearing of June 30, 1992.)

Farley has indicated that it would suffer substantial hardship if the preliminary injunction were to issue. In contrast to the time of the first preliminary injunction, Farley's Butter Toffee is now being sold throughout the United States. Preliminarily enjoining Farley from using its current butter toffee package would preclude Farley "from filling any current and future orders," resulting both "in lost profits" and lost "good will of customers who have orders pending." (Farley Mem. in Opp., p. 23.) Additionally, Farley will incur costs to destroy the infringing packaging and to create new noninfringing packaging for its butter toffee. These costs, however, are not irreparable.

On balance, the irreparable harms to Storck resulting from denying the preliminary injunction are far greater than the irreparable harms to Farley resulting from granting the preliminary injunction. The goodwill that Storck has wrapped up in its Werther's Original product is much more established than the goodwill Farley has in its butter toffee product. Werther's Original has been on the market for much longer than Farley's Butter Toffee and has been extensively promoted with particular emphasis on its trade dress. Furthermore, given the significance of Werther's Original's sales to Storck's total revenue, the impact of any loss of public perception and confidence in the Werther's Original product from consumer confusion with Farley's package greatly outweighs whatever similar loss would be suffered by Farley as a result of being required to change its butter toffee package. Finally, the public interest in avoiding marketplace confusion, in protecting product goodwill, and in fostering open and fair competition favor granting the preliminary injunction.

### B. ACTUAL LIKELIHOOD OF SUCCESS ON THE MERITS

For the reasons set forth in Part I above, the court believes that the actual likelihood of success of Storck's trade dress infringement claim addressing its Werther's Original package is substantial.

The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in plaintiff's favor in order to get the injunction. *Thornton*, 890 F.2d at 1384. The court believes that the balance of harms clearly weighs in favor of granting Storck's motion for a preliminary injunction. Given Storck's substantial likelihood of success on the merits, and upon weigh-

ing the harms to the parties and the public, a preliminary injunction must issue.

## IV. PROPER SECURITY

 Federal Rule of Civil Procedure 65(c) advises:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The security requirement of Rule 65(c) is to protect the restrained party from damages incurred by that party as a result of the wrongful issuance of an injunction. Although the court after considering the evidence believes the determination made today is correct, the court must assess the harm which would result to defendant Farley if the court is wrong and determine the proper security to be posted by plaintiff Storck.

 At the hearing in response to the court's questions, Farley proffered that its butter toffee candy has generated $500,000 in sales in the approximately four months (March, April, May and June, 1992) the product has been on the market. Farley projects that the total of 1992 sales of its butter toffee candy may exceed $5 million, which Farley estimates would be equal to 3 percent of its sales from the several hundred candy products sold by Farley. Today's ruling, however, does not prohibit the sale of Farley's Butter Toffee candy, nor does it inhibit the use of Farley's gold foil wrapper which surrounds each individual butter toffee candy sold by Farley. Therefore, the $2 million in individually wrapped candies, which has a shelf life of six to nine months, can be repackaged and sold by Farley.

Moreover, it is the present format of the outside packaging of Farley's Butter Toffee candy against which the injunction issues today. Should Farley feel confident that its position will prevail either at a full trial or on appeal, Farley should retain for future use the outside packaging of its $2 million finished product inventory of butter toffee and the packaging film banned today.[16] If, of course, Farley does not prevail, the issue regarding its damages for which the bond is posted is moot.

One other problem exists regarding Farley's packaging. As noted by the court at the conclusion of the hearing, the use of the American flag "for advertising purposes" on the outside package of Farley's Butter Toffee candy, which "is designed for temporary use and discard," appears to violate 36 U.S.C. § 176(i).[17] *See* Figure 4.

---

**16.** With the parties' cooperation, a full trial will occur in the next six months. An appellate decision on this preliminary injunction would probably also take six months from the time of the notice of appeal.

**17.** The American flag is featured on the back panels of Farley's 7–ounce bag (Pl.Ex. 275) and of one of Farley's three 40–ounce "club" bags (Pl.Ex. 304) and on the front panels of two of Farley's 40–ounce "club" bags (Pl.Exs. 303, 304).

FINE CANDIES SINCE 1891
AMERICAN OWNED AND OPERATED

**Figure 4**

Having now been apprised of the statutory law regarding proper respect for the American flag, Farley, on that basis alone, may desire to change its outside packaging for its candy products. Thus, the harm caused to Farley by this injunction would be mooted by its decision, consistent with Farley's obvious American pride, to comport its conduct to thé statutorily mandated respect for the American flag.

Moreover, as soon as Farley can market its individually wrapped butter toffee candy in an outside package that does not violate the law, it can again compete with Storck's Werther's Original candy in the marketplace.

Given these factors, the court believes that an appropriate bond to be posted by prevailing plaintiff Storck should be $1.5 million. Bond is to be posted no later than 10 days from the date of the docketing of this opinion.

## CONCLUSION

After careful consideration of the facts in light of the legal criteria applicable to the issuance of a preliminary injunction, the court concludes that Storck is entitled to a preliminary injunction with respect to Farley's use of its current trade dress for its butter toffee candy product. Storck is not entitled to a preliminary injunction with respect to Farley's use of a gold foil wrap-

per for individual pieces of its butter toffee candy product.

The court is mindful that preliminary injunctive relief should be limited to what is necessary in order to redress defendant's specific wrongful conduct. *See Mantek Division of NCH Corp. v. Share Corp.,* 780 F.2d 702, 711 (7th Cir.1986). Although individual elements of the Werther's Original package trade dress are descriptive or suggestive and not distinctive, the layout of these elements on the Werther's Original package creates an overall visual impression which is distinctive and arbitrary. Thus, the relief ordered herein is limited to addressing the overall appearance of the Farley's Butter Toffee package trade dress in order to reduce the likelihood of confusion which currently exists between the package trade dresses of Farley's Butter Toffee and Storck's Werther's Original candy.

Plaintiff Storck's second motion for a preliminary injunction is GRANTED in part and DENIED in part. Specifically,

1. Defendant Farley is preliminarily enjoined from:

(a) using any trade dress in the bottom half of the front panel of any Farley candy package which is in any way similar to the image of a mound of unwrapped candy pieces used by Storck as

trade dress for its Werther's Original butter candy.

(b) using any trade dress in the left half of the front panel of any Farley candy package which is in any way similar to the pastoral image or oval-shaped design used by Storck as trade dress for its Werther's Original butter candy.

2. Defendant Farley need not recall the butter toffee candy packages it has sold and shipped. Farley may ship its butter toffee candy in its current packages to fill orders received by Farley as of July 2, 1992 at 5:00 p.m. and not orders received thereafter. Farley is ordered to produce a listing of such orders at the status report set for Wednesday, July 8, 1992 at 10:00 a.m. for the court's *in camera* review.

3. Plaintiff Storck is to post the security required by Fed.R.Civ.P. 65 in the amount of $1.5 million within 10 days from the date of the docketing of this opinion.