## OLDE DISCOUNT CORPORATION, Plaintiff,

### v.

**W. Michael TUPMAN, individually and as Deputy Attorney General of the State of Delaware; Richard W. Hubbard, Securities Commissioner of the State of Delaware, Eugene H. Engelhardt, and Carol D. Engelhardt, Defendants.**

Civ. A. No. 92–498–SLR.

United States District Court, D. Delaware.

Sept. 16, 1992.

---

James S. Green of Duane, Morris & Heckscher, Wilmington, Del., for plaintiff. Of Counsel: Robert P. Bramnik, Thomas P. Fitzgerald, and Michael I. Behn, of Altheimer & Gray, Chicago, Ill.

W. Michael Tupman, Delaware Dept. of Justice, Wilmington, Del., for defendants W. Michael Tupman and Richard W. Hubbard.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

Before the Court is a motion for temporary restraining order, preliminary injunction and other relief filed by plaintiff OLDE Discount Corporation ("OLDE") in order to enjoin defendants from: "(1) pursuing a penal and registration revocation action against the plaintiff which will have the effect of violating plaintiff's federal right to arbitrate....; (2) pursuing an investigation of OLDE; and (3) instigating other actions against the plaintiff in Delaware or any other state, pending a hearing and determination on the issuance of a preliminary injunction." (Docket item, "D.I.", 4) Defendants Richard W. Hubbard and W. Michael Tupman (hereinafter "the State defendants")[1], the Securities Commissioner of the State of Delaware and the Deputy Attorney General representing such, respectively, have responded and oral argument was heard on August 27, 1992. Supplemental responses have been received. (D.I. 19, 28)

## II. JURISDICTION

Jurisdiction is grounded on plaintiff's claim regarding the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–10, and 28 U.S.C. § 1331.

Venue is proper in this District under 28 U.S.C. § 1391(b) because all defendants reside in this District and because the claims asserted by plaintiff arose in this District.

## III. FINDINGS OF FACT

For purposes of this proceeding, the material facts are undisputed:

1. Plaintiff OLDE is a securities firm with its principal place of business located at 751 Griswold Street, Detroit, Michigan 48226. OLDE also has a branch office located at 208 West Tenth Street, Wilmington, Delaware 19801. (D.I. 12, Ex. 1, ¶ 12)

2. OLDE is and has been registered as a broker-dealer in Delaware since October 6, 1981. Although OLDE is primarily engaged in the discount brokerage business, it does make a market in certain securities, which its agents recommend to customers. In the spring of 1990, one of the stocks was Second National Federal Savings Bank ("SNFS"), a savings and loan association with branches in Pennsylvania, Maryland, Delaware, Virginia, and the District of Columbia. (D.I. 14, Ex. 1, ¶ 15)

3. The Division of Securities of the State of Delaware is a unit within the Department of Justice directed by the Securities Commissioner under the auspices of the Attorney General pursuant to the Delaware Securities Act, 6 Del.C. § 7301 et seq.

4. In 1983, defendants Eugene H. and Carol D. Engelhardt opened a joint account with OLDE in Michigan, where they were then residing. When they moved to Delaware in 1986, they transferred their account to OLDE's Wilmington office. In the spring of 1990, their account was assigned to Michael R. Donohoe, the only securities agent employed in OLDE's Wilmington branch. (D.I. 12, Ex. 1, ¶ 22)

5. The Engelhardt's account with OLDE was governed by the terms of an Investors Account Agreement between OLDE and the defendants Engelhardt. The Investors Account Agreement in effect during the period relevant to this proceeding was signed by the defendants Engelhardt on May 25, 1990. According to their Customer Preference Profile, the defendants Engelhardt had substantial investment experience, having invested in stocks for approximately fifteen years, making an

---

1. Because the relief sought is directed at the State defendants, defendants Eugene H. and Carol D. Engelhardt have not participated in these proceedings.

average of three to five trades per year, and trading an average of five to ten thousand shares per transaction. In describing their investment objects, the defendants Engelhardt chose the following adjectives: "aggressive", "growth", "speculation". (D.I. 6, Ex. A)

6. The Investors Account Agreement entered between OLDE and the defendants Engelhardt included a "Predispute Arbitration Clause". The inclusion of the Predispute Arbitration Clause was disclosed in bold face and in large type directly above the defendants' signatures. (D.I. 6, Ex. A)

7. The Predispute Arbitration Clause itself was more specifically spelled out in the terms and conditions portion of the agreement, clauses 17 and 18, in bold type. In relevant part, the Predispute Arbitration Clause provides that the Engelhardts "agree to submit any and all controversies or claims arising out of this agreement to arbitration" according to the procedures of the New York Stock Exchange, Inc. or the National Association of Security Dealers, Inc. (D.I. 6, Ex. A)

8. In May and June 1990, the defendants Engelhardt purchased a total of ten thousand shares of the common stock of SNFS. The total purchase price of the ten thousand shares of SNFS stock was $52,-875.00. During the course of the next several months, the market price of SNFS stock declined, causing a parallel decline in the market value of the defendants Engelhardts' SNFS account. (D.I. 1, ¶ 13)

9. In July or August 1990, the defendants Engelhardt telephoned OLDE in Michigan to express their dissatisfaction with their SNFS stock purchase, given the drop in price. The defendants Engelhardt were informed that there was no basis for their complaint, that their SNFS stock purchases were not inappropriate. (D.I. 1, ¶ 15)

10. According to the record, the defendants Engelhardt were advised at that time that they should submit a written complaint to OLDE regarding the circumstances of their claim if they wished to initiate a complaint and/or a fuller review. (D.I. 1, ¶ 15) No written complaint was ever submitted, although the Investors Account Agreement, clause 12, expressly requires investors to object, in writing, within ten days regarding any transactions in their account which are in dispute. (D.I. 1, ¶ 18; D.I. 6, Ex. A)

11. On September 6, 1990, the defendants Engelhardt transferred their SNFS stock out of OLDE. The market value of their SNFS stock at the time of the transfer was approximately $32,500.00, a decline of approximately $20,375.00 from their initial investment. (D.I. 1, ¶ 17)

12. In July 1991, the Division of Securities of the State of Delaware received a complaint from the defendants Engelhardt against OLDE and its agent (by now a former agent), Michael Donohoe, with regard to the purchase of the SNFS stock in May and June of 1990. (D.I. 6, Ex. C; D.I. 12, ¶ 2)

13. By letter dated July 31, 1991, a securities investigator for the Delaware Department of Justice advised OLDE of the Engelhardts' complaint. The securities investigator related that "[t]he Engelhardts allege that the solicitation to purchase [the SNFS stock] involved omission of material facts (including the risk factor) and high pressure selling techniques. They further allege that Mr. Donohoe marked at least one purchase 'unsolicited'. Finally, they allege that this security was unsuitable for persons in their circumstances." The securities investigator requested that OLDE respond to these allegations by August 26, 1991. (D.I. 6, Ex. C; D.I. 12, ¶ 2) OLDE responded to this and subsequent requests for documents and information. (D.I. 6, Ex. E; D.I. 12, ¶ 2–4)

14. By late May 1992, the Division of Securities had completed its investigation of the Engelhardts' complaint and on June 5, 1992, defendant Tupman sent to OLDE a draft "Notice of Intent to Suspend or Revoke Broker–Dealer Registration", alleging various violations of the Delaware Securities Act, 6 Del.C. §§ 7301 et seq. (D.I. 12, ¶ 5) In said Notice, defendant Tupman stated that it was in the public interest that: 1) the broker-dealer registration of OLDE be suspended or revoked; 2) Donohoe be per-

manently barred from engaging in the securities business in Delaware; 3) OLDE rescind the three sales of SNFS stock to the defendants Engelhardt, and pay the Engelhardts back their purchase price of $52,875.00; and 4) OLDE be fined $10,000.00 for each and every violation of the Act, and that OLDE pay all of the costs incurred by the Division of Securities in connection with the investigation and prosecution of the case. (D.I. 6, Ex. F)

15. By letter dated June 25, 1992, OLDE asserted that the proposed administrative proceeding against OLDE for Donohoe's alleged sales practice abuses was not warranted. OLDE also offered to settle the Engelhardts' claim concerning their SNFS stock purchases by offering $20,000.00 as compensation for all of the losses which were allegedly caused by Donohoe's conduct. In the alternative, OLDE offered to "pay all filing and form fees for the Engelhardts' claim to be heard and decided by an arbitration panel before the National Association of Securities Dealers, Inc., the New York Stock Exchange, Inc. or the American Arbitration Association." (D.I. 6, Ex. G)

16. By letter dated July 6, 1992, defendant Tupman responded:

> In considering your offer of settlement, I assume that the $20,000.00 figure represents the difference between the price paid by the Engelhardts for their SNFS stock, and the current market value. Given the allegations of unsuitability, I think it much more appropriate for there to be a rescission of the trades, with your firm receiving the stock back, and the Engelhardts their purchase price ($52,875.00).

> In addition, because of the seriousness of the allegations, and the State's preparedness to prosecute, the public interest would require a substantial contribution to the Investor Protection Fund, as well as written undertakings regarding compliance procedures in your Wilmington branch office.

> I do not intend to continue any further written dialogue on the allegations in the draft Notice. I think you have fully set forth your position in your last letter, and I am not amenable to any continued "back and forth" responses. Instead, I suggest you call me later this week (and in no event later than noon on Friday, July 10), to discuss the terms of settlement. Otherwise, the Securities Division is prepared to submit the charges to the Commissioner for his approval on July 13.

(D.I. 6, Ex. H)

17. At an August 5, 1992 settlement meeting attended by defendant Tupman and representatives of plaintiff OLDE, defendant Tupman once again rejected OLDE's offer of restitution to the Engelhardts in the amount of $20,375.00 and instead demanded rescission in the amount of $52,875.00, on the grounds that rescission would be more beneficial and fair to the Engelhardts. Defendant Tupman also stated that the Engelhardts refused to arbitrate their civil claims; rather, the Engelhardts had selected the Delaware Securities Commissioner's Office to pursue their claim. (D.I. 6, Ex. I)

18. After the August 5, 1992 meeting with defendant Tupman, OLDE gave written notice of its demand that the Engelhardts arbitrate their civil claim against OLDE concerning their SNFS stock purchase pursuant to their arbitration agreement and the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. The August 5, 1992 notice stated as follows:

> We have been informed by Delaware Deputy Attorney General, W. Michael Tupman, that you have complained to him about the purchase of SNFS stock through OLDE Discount. He further advises that you believe that you have a remedy under the restitution provision set forth in section 7325(b) of the Delaware Code. We disagree.

> You have agreed with OLDE Discount to resolve any and all disputes by arbitration before either the New York Stock Exchange ("NYSE") or the National Association of Security Dealers, Inc. ("NASD"). You further have agreed to make an election within five days of written demand of such election. Please con-

sider this letter our written demand that you make such election.

(D.I. 6, Ex. K)

19. According to his affidavit, defendant Tupman met with the defendants Engelhardt on August 10, 1992 to inform them that plaintiff OLDE had made a settlement offer, to wit, to pay $15,000.00 to the Delaware Investors Protection Fund, in lieu of a fine, and to pay $20,375.00 in full restitution to the Engelhardts for the depreciation in value of their SNFS stock during the entire period of time that the stock was held in their OLDE account. Both defendants Engelhardt "emphatically agreed that they wanted the State to go forward with its case." (D.I. 12, ¶ 11)

20. Also on August 10, 1992, defendant Tupman represented in a letter to OLDE the following:

> [I]t has come to our attention that by letter dated August 5, 1992 ..., you tried to pressure the Engelhardts into an NASD arbitration, even though we had discussed that legal issue at our meeting the same day, and the State had disagreed with your legal position. I find this further evidence of your bad faith, and therefore terminate settlement negotiations. Your last offer is rejected.
>
> Enclosed are written interrogatories served pursuant to Section 7319 of the Delaware Securities Act. An officer, director, or duly authorized agent of OLDE must answer those interrogatories, under oath, and return them to me no later than seven business days after the date of this letter. In addition, with regard to each individual identified in your response to Interrogatory No. 1, we ask that you produce his or her new account form and customer preference profile, and with regard to each transaction identified in your response to Interrogatory No. 2, we ask that you produce the confirmation of purchase. Further, we ask that you produce copies of any letters of complaint, and any response you made, from any Delaware residents with regard to those transactions. You

have until the close of business on August 24, 1992 to produce that documents.

(D.I. 6, Ex. M)

21. A Notice of Intent to Suspend or Revoke Broker–Dealer Registration was filed by the Division of Securities on August 17, 1992. Defendant Hubbard, the Securities Commissioner, also signed an order of that same date giving OLDE thirty days to request a hearing on the matter. (D.I. 12, Ex. 1)

22. On August 17, 1992, the Department of Justice issued a press release concerning the Notice of Intent against OLDE. An article reporting the Notice appeared the next day in the News Journal. (D.I. 6, Ex. N)

23. On August 19, 1992, OLDE provided timely responses to defendant Tupman's interrogatories. (D.I. 1, ¶ 39)

24. Plaintiff filed its motion for temporary restraining order, preliminary injunction and other relief on August 25, 1992, alleging, *inter alia,* that: 1) application and enforcement of § 7325(b) of the Delaware Securities Act, 6 Del.C. § 7325(b), is unconstitutional under Article VI, clause 2 of the United States Constitution (the "Supremacy Clause"); 2) the application of 6 Del.C. § 7325(b), as amended, to the actions of OLDE in 1990 constitutes the imposition of an *ex post facto* penalty in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States; 3) defendants Tupman and Hubbard have acted under color of state law to deprive the plaintiff of its rights under the Federal Arbitration Act and under the Due Process Clause in violation of 42 U.S.C. § 1983; and 4) defendant Tupman has committed willful acts in the use of process not proper in the regular conduct of these administrative proceedings. (D.I. 1)

## IV. CONCLUSIONS OF LAW

The standard for obtaining a temporary restraining order is the same as the standard for a preliminary injunction. Fed. R.Civ.P. 65(b); *Tootsie Roll Industries, Inc. v. Sathers, Inc.,* 666 F.Supp. 655, 658 (D.Del.1987). It is beyond dispute that "the grant of injunctive relief is an 'ex-

traordinary remedy, which should be granted only in limited circumstances.'" *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989), *citing Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988). Thus, in ruling on a motion for a preliminary injunction, this Court must consider:

> (1) the likelihood that the [movant] will prevail on the merits at final hearing; (2) the extent to which the [movant] is irreparably harmed by the conduct complained of; (3) the extent to which the [nonmoving party] will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir.1990). As recently reaffirmed by the Third Circuit, an

> injunction should issue only if the [movant] produces evidence sufficient to convince the ... [C]ourt that all four factors favor preliminary relief.

*Merchants & Evans, Inc. v. Roosevelt Bldg. Products, Co.*, 963 F.2d 628, 632–633 (3d Cir.1992). *See also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d at 800, *quoting In re Arthur Treachers Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

### A. *Reasonable Probability of Success on the Merits*

#### 1. Pre-emption

■ Plaintiff's primary argument in support of its request for injunctive relief is that § 7325(b) of the Delaware Securities Act, as amended, 6 Del.C. § 7325(b), is unconstitutional because it directly conflicts with the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–10. The primary substantive provision of the FAA states that

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exists at law or in equity for the revocation of any contract.

9 U.S.C. § 2. As explained by the Supreme Court in *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987),

> "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Enacted pursuant to the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, this body of substantive law is enforceable in both state and federal courts. *Southland Corp. v. Keating*, 465 U.S. 1, 11–12, 104 S.Ct. 852, 858–859, 79 L.Ed.2d 1 (1984).... As we stated in *Keating*, "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contacting parties agreed to resolve by arbitration." *Id.*, at 10, 104 S.Ct. at 858. "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Id.*, at 16, 104 S.Ct. at 861 (footnote omitted). Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable "upon such grounds as exist at law or in equity of the revocation of any contact." 9 U.S.C. § 2. "We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law." *Keating, supra*, at 11, 104 S.Ct., 858.

*Id.* 482 U.S. at 489, 107 S.Ct. at 2525.

In the case of *Perry v. Thomas*, Thomas sued his former employer, Kidder Peabody & Co., for breach of contract, conversion, civil conspiracy to commit conversion, and breach of fiduciary duty, for which he sought compensatory and punitive dam-

ages. Thomas refused to submit the dispute to arbitration based on § 229 of the California Labor Code, which authorized Thomas to maintain an action for wages. The Supreme Court, in holding that the Supremacy Clause and § 2 of the FAA preempted the state statute, concluded:

> [T]he present appeal addresses the preemptive effect of the Federal Arbitration Act, a statute that embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. Its general applicability reflects that "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered...." [*Dean Whitter Reynolds Inc. v. Bird*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)]. We have accordingly held that these agreements must be "rigorously enforce[d]." *Ibid.; see Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185] ... (1987); *Mitsubishi Motor Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625–626 [105 S.Ct. 3346, 3353–3354, 87 L.Ed.2d 444] ... (1985). This clear federal policy places § 2 of the Act in unmistakable conflict with California's § 229 requirement that litigants be provided a judicial forum for resolving wage disputes. Therefore, under the Supremacy Clause, the state statute must give way.

482 U.S. at 490, 107 S.Ct. at 2526. *Accord, Securities Industry Asso. v. Connolly*, 883 F.2d 1114 (1st Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990) (a Massachusetts state regulation which: (1) barred firms from requiring individuals to enter pre-dispute arbitration agreements as a nonnegotiable condition precedent to account relationships; (2) ordered the prohibition brought "conspicuously" to the attention of prospective customers; and (3) demanded full written disclosure of "the legal effect of the predispute arbitration contract or clause", pre-empted by the FAA); *Osterneck v. Merrill Lynch, Pierce, Fenner & Smith*, 841 F.2d 508 (3d Cir.1988) (provision of the Pennsylvania Securities Act, identical to § 410(g)

of the Uniform Securities Act and precluding enforcement of an agreement to arbitrate, pre-empted by the FAA).

■ Not only does the FAA pre-empt state statutes which provide a judicial forum for resolving disputes, "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp.*, —— U.S. ——, ——, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991). The issue before the Court in *Gilmer* was whether a claim under the Age Discrimination and Employment Act of 1967 ("ADEA"), could be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application. The Court, recognizing that "the ADEA is designed not only to address individual grievances, but also to further important social policies", found no

> inherent inconsistency between those [social] policies ... and enforcing agreements to arbitrate age discrimination claims. It is true that arbitration focuses on specific disputes between the parties involved. The same can be said, however, of judicial resolution of claims. Both of these dispute resolution mechanisms nevertheless also can further broader social purposes. The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but, as noted above, claims under those statutes are appropriate for arbitration. "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi, supra*, 473 U.S., at 637 [105 S.Ct. at 3359]....

—— U.S. at ——, 111 S.Ct. at 1653. Noting the "liberal federal policy favoring arbitration agreements", the Court concluded that Gilmer's ADEA claim was subject to compulsory arbitration.

State defendants argue that the Delaware Securities Act does not directly conflict with the FAA in that no provision

specifically precludes plaintiff from pursuing its right to arbitrate. And, indeed, no provision of the Delaware Securities Act even mentions arbitration. There is no question, however, that the regulatory scheme as currently drafted contemplates administrative proceedings which effectively eliminate a party's right to an arbitral forum.

Under the Delaware Securities Act, 6 Del.C. §§ 7301 *et seq.*, the Securities Commissioner is authorized to suspend or revoke the registration of a broker-dealer or agent, if he determines that such person is subject to one of the disqualifying factors stated in that section and that such action is in the public interest. 6 Del.C. § 7316(a). Subsection (g) of § 7316 also authorizes the Commissioner, "upon notice and hearing", to fine any broker-dealer, investment advisor or agent in an amount not to exceed $10,000.00 for each and every violation of the chapter, plus the cost of investigation and prosecution.

In addition to the public enforcement authority vested in the Securities Commissioner under § 7316, § 7323 provides as well for private causes of action for rescission brought by injured investors. More specifically, § 7323 provides in relevant part that "[a]ny person who ... sells ... a security by means of any untrue statement of a material fact or any omission to state a material fact ... is liable to the person buying ... the security ..., who may sue either at law or in equity to recover the consideration paid for the security...." Subsection (g) of § 7323, modeled after § 410(g) of the Uniform Securities Act, provides:

> (g) Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any rule or order hereunder is void.

This subsection is identical to the Pennsylvania statute reviewed by the Third Circuit in *Osterneck*, 841 F.2d at 510, which sub-

section was found to be pre-empted by the FAA.

Although the Delaware Securities Act provides that any person aggrieved by an order of the Securities Commissioner may obtain a review of the order in the Court of Chancery, the commencement of the judicial review proceedings does not, unless specifically ordered by the Court of Chancery, operate as a stay of the Commissioner's order. 6 Del.C. § 7324.

Section 7325(b) of the Delaware Securities Act, the statutory provision primarily at issue, was amended in July 1990 to provide:

> (b) The Commissioner may make, amend and rescind rules, regulations, forms and orders to carry out and define the provisions of this chapter. Such orders may provide for fines, assessment of costs, restitution to investors, conditional or probationary registration, centaur or reprimand, special reporting requirements, or other provisions which the Commissioner determines to be in the public interest.

Subsequently, in June 1991, subsection (b) was amended once again to provide:

> Any person, whether registered or not, who willfully violates any provision of this chapter, or who aides and abets any person who willfully violates any provision of this chapter, may be fined in accordance with subsection 7316(g) and order to pay restitution and costs (*or to rescind the transaction or transactions and pay costs*) if the Commissioner finds it in the public interest, and may be criminally prosecuted under § 7322.[2]

Although there apparently is no caselaw directly on point involving state administrative proceedings that impede a party's right to enforce a predispute arbitration agreement, the Securities Commissioner cannot use his authority under 6 Del.C. § 7325(b) as both a sword—to enforce under § 7325(b) investors' personal rights to rescission provided under § 7325(a)—and a shield—to insulate the investors from a

---

**2.** Although the State defendants maintain that the Delaware Securities Act is "modeled on the Uniform Securities Act" (D.I. 10 at 21), the

Court can find no counterpart in the Uniform Act to § 7325(b) as amended.

contracted to arbitral forum by insisting on the primacy of the State's administrative forum—without running afoul of the Supremacy Clause of the Constitution.[3] There is no contention that the arbitration agreement at issue is not enforceable under the FAA. Neither is there a contention at bar that the defendants Engelhardt may not effectively vindicate their statutory cause of action in the arbitral forum.

■ Given the clear Congressional intent "to provide for the [rigorous] enforcement of arbitration agreements within the full reach of the Commerce Clause", *Perry v. Thomas*, 482 U.S. at 490, 107 S.Ct. at 2526, as given effect by the Supreme Court's interpretation of the FAA, the Court concludes that the FAA serves to withdraw the power of the states not only to require a judicial forum for the resolution of claims, but to require an administrative forum as well. In sum, then, the FAA preempts § 7325(b) insofar as that statute allows the Securities Commissioner to order rescission on behalf of individual investors who have signed predispute arbitration agreements.

### 2. Primary Jurisdiction

■ The State defendants argue that the FAA does not pre-empt the administrative proceedings at bar by virtue of the doctrines of primary jurisdiction or, alternatively, the exhaustion of administrative remedies. As explained by the United States Supreme Court in *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956),

[t]he doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by the administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 63–4, 77 S.Ct. at 165.

Applying this lucid explanation to the facts at bar, the Court concludes, first, that the doctrine of primary jurisdiction does not apply. As further illustrated by the Supreme Court in *United States v. Western Pacific Railroad Co.*, "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." 352 U.S. at 64, 77 S.Ct. at 165. Thus, in that case, the Court concluded that

where the question is simply one of construction [of a tariff] the courts may pass on it as an issue "solely of law." But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that "the enquiry is essentially one of fact and of discretion in technical matters," then the issue of tariff application must first go to the [Interstate Commerce] Commission. The reason is plainly set forth: such a "determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is

---

**3.** The Supremacy Clause provides that:
This Constitution, and the Law of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. Const., Art. VI, cl. 2.

commonly to be found only in a body of experts."

352 U.S. at 65–66, 77 S.Ct. at 166 (citations omitted). Unlike the interpretation of a tariff, which can involve complex and technical cost-allocation and accounting problems, enforcement of the Engelhardts' claim does not require the resolution of any issue "placed within the special competence of" the Delaware Securities Commissioner. Indeed, the statutory scheme contemplates that such claims are appropriately resolved in a judicial forum at the investors' discretion; such claims are within the conventional experience of federal judges.

### 3. Exhaustion of Administrative Remedies

■ Nor does the doctrine of exhaustion of administrative remedies apply, since the claim at issue, i.e., the Engelhardts' claim for rescission, is not cognizable in the first instance by an administrative agency *alone.* Although by amending § 7325(b) and giving to the Securities Commissioner the authority to order rescission, private litigants (like the defendants Engelhardt) may no longer need to sue in law or in equity for rescission under § 7323(a), the Delaware Securities Act still gives private litigants that option and still specifically provides that "[t]he rights and remedies provided by this chapter are *in addition to* any other rights or remedies that may exist at law or in equity." 6 Del.C. § 7323(h) (emphasis added). Thus, unlike the "comprehensive system of review" established by the National Association of Securities Dealers, Inc. and the Securities and Exchange Commission, *see First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 695 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), the statutory review procedure in question does not establish original and/or exclusive jurisdiction in the administrative proceeding.

■ Even if the exhaustion doctrine would normally apply, the Third Circuit has "recognized two situations in which the exhaustion requirement will not be adhered to: (1) when the administrative procedure is clearly shown to be inadequate to prevent irreparable injury; or (2) when there is a clear and unambiguous statutory or constitutional violation." *Id.* at 696. Plaintiff asserts that both exceptions apply to the facts at bar by virtue of the pre-emption of the FAA. The Court agrees.

If the administrative process vis.a.vis the State's rescission action under 6 Del.C. § 7325(b) is allowed to go forward, plaintiff's right to enforce the arbitration agreement entered into between it and the Engelhardts is rendered a nullity, regardless of the substantive result of the administrative proceeding. The loss of the federal substantive right to an arbitral forum is distinguishable from the business losses claimed in *First Jersey Securities, Inc. v. Bergen,* 605 F.2d at 696. Concomitantly, the Commissioner's usurpation of the parties' contractual obligation to arbitrate constitutes a clear and unambiguous violation of the Supremacy Clause as interpreted by the Supreme Court, as discussed above.

### 4. Abstention

■ In their supplemental submission (D.I. 19), the State defendants assert that the abstention doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is applicable to the facts at bar. In *Younger v. Harris,* the Supreme Court held that a federal court should not enjoin a pending state criminal proceeding except in the very unusual situation that an injunction is necessary to prevent great and immediate irreparable injury. The Supreme Court has since applied the *Younger* principles to "state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claims." *Ohio Civil Rights Commissioner v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 2722–23, 91 L.Ed.2d 512 (1986). In that case, the administrative proceedings at issue were instituted by the Ohio Civil Rights Commission against a school which had terminated an individual's employment. The employee claimed her termination constituted sex discrimination; the school claimed that any investigation of the school's hiring process or any imposi-

tion of sanctions for the school's termination decisions would violate the Religion Clauses of the First Amendment, since the termination was based on the employee's failure to comply with an internal dispute resolution mechanism (the "biblical chain of command"). The Court held that: 1) the elimination of prohibited sex discrimination is a sufficiently important state interest to bring the case within the ambit of the *Younger* doctrine; and 2) the school will receive an adequate opportunity to raise its constitutional claims, if not in the administrative proceeding, then in the state courts' judicial review of the administrative proceeding.

Assuming for purposes of this proceeding that the Securities Commissioner's decision to enforce private, as well as public, interests is "a sufficiently important state interest to bring the case within the ambit of the *Younger* doctrine", nevertheless the question remains whether plaintiff will receive "a full and fair opportunity to litigate [its] constitutional claim[s]" within the state regulatory scheme. To the extent the claims have relevance given the Court's decision on pre-emption, the state regulatory scheme (which provides for judicial review) affords plaintiff an opportunity to raise its claims based upon the Due Process Clause of the Fourteenth Amendment (*ex post facto* penalties and abuse of process) and 42 U.S.C. § 1983.

Such is not the case with respect to plaintiff's preemption claim. Under the auspices of the FAA, plaintiff is guaranteed in the first instance an arbitral forum in which to resolve the Engelhardts' dispute. Any other forum, whether administrative or judicial, will deprive plaintiff of its federal substantive rights under the FAA, indeed, of its opportunity to even raise its constitutional claim under the FAA. Consequently, the *Younger* doctrine is not applicable to plaintiff's pre-emption claim under the FAA.

**B.   *Irreparable Harm***

■   As indicated above, the Court has concluded that plaintiff has demonstrated a reasonable probability of success on the merits on its claim that it will be deprived of its constitutionally protected federal right to arbitrate its civil dispute with the defendants Engelhardt should the administrative action for rescission be allowed to proceed.   Likewise, the Court concludes that the loss of its federal substantive right to arbitrate, should injunctive relief be denied, constitutes irreparable harm clearly distinguishable from purely economic losses.   *See, Alascom, Inc. v. ITT North Electric Co.*, 727 F.2d 1419, 1422 (9th Cir.1984) (if a party "must undergo the expense and delay of a trial before being able to appeal, the advantages of arbitration—speed and economy—are lost forever.   We find this consequence 'serious, perhaps irreparable'."); *Opticians Ass'n of America*, 920 F.2d at 195 (irreparable harm must be "of a peculiar nature, so that compensation and money alone cannot atone for it."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir.1985).

**C.   *Balance of Hardships***

■   In weighing the possibility of harm to other interested parties from the granting of the injunction and the public interest, *Opticians Ass'n of America*, 920 F.2d at 196, several factors support the Court's conclusion that the form and magnitude of the relief contemplated by the Court are justified under the Third Circuit's preliminary injunction standards.   First, the Court is granting preliminary injunction relief only with respect to the State's ability to pursue rescission actions under 6 Del.C. § 7325(b) on behalf of private investors who have entered predispute arbitration agreements enforceable under the FAA. The State is not prevented from enforcing the public's interests through actions authorized under 6 Del.C. § 7316.

Moreover, the defendants Engelhardt are not harmed or disadvantaged in any way by the entry of such an injunction.   The defendants Engelhardt are free to exercise their right to have their claim heard and decided in arbitration, consistent with their arbitration agreement with plaintiff and in accordance with the FAA.   The effect of the injunction, therefore, will be to leave the parties in the position that they bargained for, with an arbitral forum as plain-

tiff has demanded. Finally, issuance of the injunction will advance all the strong federal purposes inherent in the FAA, such as allowing the parties "to avoid the costliness and delays of litigation." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974).

### D. *Bond*

The relief requested "raises no risk of monetary harm to the defendants" and, thus, a bond is unwarranted. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir.1990); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d at 103.

### V. CONCLUSION

For the reasons stated, the Court concludes that plaintiff has satisfied the standard for obtaining a preliminary injunction and, therefore, plaintiff's request for injunctive relief is granted with respect to the Securities Commissioner's authority to pursue a rescission action under 6 Del.C. § 7325(b) on behalf of the defendants Engelhardt, individual investors who are parties to a predispute arbitration agreement with plaintiff, which agreement is enforceable under the Federal Arbitration Act, 9 U.S.C. § 2. The remainder of plaintiff's request for injunctive relief is denied.